PER CURIAM:
{¶ 1} Appellant Douglas C. Shine, Jr. ("appellant") appeals from his convictions for multiple counts of aggravated murder, murder, felonious assault, and other offenses in connection with four shootings. Appellant assigns 21 errors for our review.[1] Having reviewed the record and pertinent law, we affirm the decision of the trial court. The apposite facts follow.
{¶ 2} Following a shooting at East 149th Street on January 24, 2015, appellant was indicted in Cuyahoga C.P. No. CR-15-595119 for felonious assault against Walter Barfield ("Barfield"), John Harvell ("Harvell"), and Dominique Westbrook ("Westbrook"), discharge of a firearm near prohibited *170 premises, and having a weapon while under disability.
{¶ 3} Appellant was also indicted in Cuyahoga C.P. No. CR-16-606156A in connection with additional shootings. One subset of charges pertained to the January 20, 2015 attempted murder of Stefon Robinson ("Robinson"), and charged appellant with attempted murder, two counts of felonious assault, improperly discharging a weapon into a habitation, and having a weapon while under disability. A second subset of charges pertained to a January 22, 2015 shooting outside John Adams High School, and charged appellant with attempted murder, felonious assault, improperly discharging a weapon, and having a weapon while under disability.[2] A third subset of charges arose in connection with the February 5, 2015 shooting at Chalk Linez Barbershop in Warrensville Heights in which Barfield, Brandon White-Ladson ("Brandon"), and William Gonzalez ("Gonzalez") were killed, and three others were wounded. This group of charges set forth six counts of aggravated murder, aggravated burglary, three counts of murder, three counts of attempted aggravated murder, 20 charges of felonious assault, and having a weapon while under disability. The fourth subset of charges pertained to the June 4, 2015 fatal shooting of Aaron Ladson ("Ladson"), a witness to the barbershop shooting. This group of charges alleged aggravated murder, conspiracy to commit aggravated murder, and two counts of felonious assault. The indictment also set forth multiple one-year and three-year firearm specifications, gang specifications, notice of prior conviction (from a 2012 aggravated burglary) and repeat violent offender specifications.
{¶ 4} Appellant pled not guilty to all charges. The state moved to join the two indictments, arguing that the January 24, 2015 and February 5, 2015 shootings were both directed at Barfield, and involved the same weapon, and the June shooting was to prevent Ladson from testifying regarding the February 5, 2015 shooting. The court granted the motion for joinder, and all charges proceeded to a jury trial under CR-16-606156-A. The trial court held a voir dire hearing on the admissibility of various eyewitness testimony and a statement Ladson gave to the police several months before his death. The court denied a defense motion to suppress this evidence. The counts of having weapons while under disability were tried to the court, and the remaining charges were tried to a jury.
The January 20, 2015 Shooting
{¶ 5} The state's evidence indicated that the Loyal Always gang operates in the area of the Lenacrave Avenue and Angelus Avenue in Cleveland. According to the state's evidence, it engages in criminal activity and its members included Robinson, Barfield, Lamar Sears ("Sears"), and Jesus Bey ("Bey"). Appellant was a member of a different criminal gang, the Heartless Felons.
{¶ 6} On January 20, 2015, police responded to a shooting and found Robinson, who had been shot 12 times, in front of his grandmother's home on Angelus Avenue. Robinson survived that shooting and refused to identify his assailant.
{¶ 7} Bey, who was incarcerated in the county jail when Robinson was shot, telephoned appellant and accused him of the shooting. In this tape recorded phone call, appellant stated that "Ching [Robinson]
*171 know what he did * * * he * * * tried to get up on me," and was also armed.
The January 24, 2015 Shooting at East 149th Street
{¶ 8} On January 24, 2015, Westbrook and Harvell were parked near the address of 3597 East 149th Street. They saw a man get out of a car, then heard gunshots. Westbrook reported the incident to police. Three bullet holes were in her car. Police recovered 39 spent 9 mm shell casings from the area. Ballistic examination linked 14 of the casings to a Luger handgun and 25 were either from a Glock, Smith & Wesson Sigma, or Springfield Armory pistol. Four .45-caliber shell casings were recovered from the porch of the house. Cell phone tower information indicated that appellant's and Barfield's cell phones were in the general vicinity during the time of the shooting.
The February 5, 2015 Shooting at Chalk Linez Barbershop
{¶ 9} At approximately 7:30 p.m., a man armed with two handguns entered the Chalk Linez Barbershop in Warrensville Heights. The man, who was wearing a black-hooded sweatshirt, shot 23-year-old Barfield approximately 20 times, killing him. The assailant also shot and killed 31-year-old Brandon and 32-year-old Gonzalez, one of the shop's owners. Whitney Clay, an employee, was shot once in the arm and survived. Customers Sears and Christopher Perkins ("Perkins") were shot multiple times and also survived their injuries.
{¶ 10} Cell phone evidence placed appellant in the vicinity of the barbershop. Cosmetologist Jasmine Evans was certain that appellant was the assailant, and she identified him in a photo array and again in court. Christopher Perkins was also certain that appellant was the assailant, likewise identifying him in a photo array and again in court.
{¶ 11} Immediately after the shooting, barber Alvin Wright told police that the assailant was a "tall, light skinned guy, bushy eyebrows with a little goatee." Wright fled the city but later met with police secretly to provide them with an Instagram photo of appellant. Wright was certain that the photo he provided depicted the assailant.
{¶ 12} Sears also identified appellant as the assailant. However, he admitted that his testimony was provided in exchange for "promises" made by the state regarding Sears's pending drug charges, and that he hoped to receive probation in that case. Barbershop employee Jameel Bell also identified appellant as the shooter with certainty, but he equivocated on some details of his description of the assailant. Whitney Clay observed that the shooter had a teardrop tattoo. She identified appellant in a photo array, but was unable to make an in-court identification.
{¶ 13} Other individuals who were in the barbershop at the time of the shooting were unable to identify the assailant.
{¶ 14} Several days after the barbershop shooting, Ladson spoke with Warrensville Heights police and made a written statement identifying appellant as the assailant. Warrensville Heights Police Detective Parris Johnson ("Det. Johnson") also conducted a videotaped interview of Ladson. According to Ladson's statements, Ladson, Barfield, and Sears went to the barbershop and waited for haircuts. Ladson, who was under indictment for drug charges, left to meet with his lawyer. When he returned, he sat in his car that was parked outside the barbershop and spoke with his wife on his cell phone. He observed appellant enter the barbershop. A short time later, Ladson saw appellant exit with guns in each hand. Appellant aimed his weapons at Ladson and repeatedly *172 told Ladson that he had spared his life, before fleeing the scene. Ladson left the barbershop but returned a short time later to find out what had happened to his brother, Brandon.
{¶ 15} Ladson went to SouthPointe Hospital to check on his brother. While at the hospital with his wife Shirley, Ladson received a call from appellant. In this call, which was overheard by Shirley, Ladson accused appellant of killing his brother. Approximately an hour later, according to both Shirley's testimony and Ladson's statement to police, appellant called Ladson again and said, "[W]hy [are] you saying my name? I'm going to kill you."
{¶ 16} A total of 35 shots were fired in the barbershop shooting. Ten shell casings from the crime scene were from a .40-caliber a Glock, Smith & Wesson or Springfield Armory pistol, and 25 were from a 9 mm Luger. This was the same Luger that was used during the January 24, 2015 shooting. Additionally, a .45-caliber Rock Island Armory handgun was found tucked into Barfield's waistband, and this weapon was also linked to the January 24, 2015 shooting.
{¶ 17} Cuyahoga County Regional Forensic Science Laboratory Forensic Scientist Carey Baucher ("Baucher") testified that appellant was the major contributor of DNA found on five Luger shell casings recovered from the barbershop. A minor contributor was also present "at a very low level" but this contributor was deemed inconclusive to insufficient information. Baucher also opined that the DNA was present though primary transfer, or actually touching the casings.
The June 4, 2015 Shooting
{¶ 18} Appellant was arrested and incarcerated approximately one week after the barbershop shootings. Ladson went to stay with his grandmother on Harvard Avenue. In recorded phone calls from the Cuyahoga County Jail, appellant asked his brother, Kevin McKinney ("McKinney") if "Pudge," a.k.a. Ladson, made a statement about him. McKinney asked, "His statement got you charged, right?" Appellant responded affirmatively, and instructed McKinney to have a family member print out the discovery in his case. A short time later, McKinney's girlfriend purchased a Pure Talk flip phone, and left it at McKinney's house.
{¶ 19} While at the Justice Center in connection with pending drug cases, Ladson and Shirley ran into McKinney. According to Shirley, McKinney called Ladson "a snitch ass bitch." On May 13, 2015, Lawrence Kennedy ("Kennedy"), a friend of appellant's texted, "Text me da address" to the Pure Talk flip phone left with McKinney. In response, Kennedy received the address of Ladson's grandmother on Harvard Avenue.
{¶ 20} On June 3, 2015, appellant called McKinney from jail and McKinney said that he hoped he would have some "good news" for appellant when he visited him later. That evening, there was a home invasion approximately five houses away from where Ladson was staying, and the assailants were looking for "Pug."
{¶ 21} On the morning of June 4, 2015, Ladson was gunned down in the driveway of his grandmother's home. Police chased a suspect but did not catch him.
{¶ 22} The gang impact unit of the Cleveland Police, working together with the Sheriff's Office, set up surveillance equipment to record appellant's statements during the planned visit with McKinney. During this conversation, appellant told McKinney to deny any knowledge of the phone number that communicated with Kennedy.
{¶ 23} Kennedy was subsequently shot and killed on June 7, 2015. His cell phone *173 was taken into evidence, and police obtained text messages from the phone. Approximately two weeks before Ladson's murder, Kennedy texted "what is da address?" The response provided Ladson's grandmother's address. On the day of the murder, Kennedy also texted "Checkmate" to the Pure Talk phone. After an inquiry as to whether it was "done," Kennedy responded affirmatively and received word back to get rid of his phone and that he would receive a new one. Kennedy also texted that he was being chased by police. Police determined that Kennedy's phone was in the vicinity of both the Harvard Avenue home invasion and the murder of Ladson.
{¶ 24} The defense moved for a judgment of acquittal that was denied in its entirety. Appellant presented expert testimony from Dr. Harvey Shulman ("Dr. Shulman") who was qualified as an expert in the field of eyewitness testimony. According to Dr. Shulman, identification of an armed assailant may be rendered unreliable where "weapons focus" impairs perception. Poor visibility, loud noises, and little time to process also impair the process of encoding a memory. Further, misidentification may occur from viewing an image depicted in the news, or in a line-up, as "post-event distortion" that causes new information to taint the witness's memory. Misidentification may also occur even where the witness has some familiarity with the suspect, but erroneously recalls where and when they actually saw the individual. Finally, Dr. Shulman testified that a witness's apparent confidence level in the identification does not necessarily reflect accuracy.
{¶ 25} Appellant was acquitted of all charges pertaining to the January 22, 2015 shooting, two felonious assault charges, and several specifications. He was convicted of all remaining charges. The jury recommended that appellant receive the death penalty, but the trial court sentenced him to four consecutive life sentences without the possibility of parole, plus 380 years for the other offenses.
I. Joinder
{¶ 26} In the first assigned error, appellant argues that the trial court committed prejudicial error in granting the state's motion for joinder of the two indictments for trial. He asserts that the charges were too numerous, too complicated, too unrelated in time, and presented too high a risk of prejudice to be tried together. In opposition, the state argues that the ruling was proper because the events were interconnected and part of a common course of conduct involving related shootings.
{¶ 27} We review a trial court's decision on joinder for an abuse of discretion. State v. Nitsche , 2016-Ohio-3170, 66 N.E.3d 135, ¶ 90 (8th Dist.) ; State v. Banks , 2015-Ohio-5413, 56 N.E.3d 289, ¶ 64 (8th Dist.).
{¶ 28} Under Crim.R. 8(A), indictments may be joined if they "are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."
{¶ 29} Ohio law " 'favors joining multiple offenses in a single trial' " if the requirements for joinder under Crim.R. 8(A) are met. Nitsche at ¶ 85, quoting State v. Dean , 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 59. "Joinder is 'liberally permitted' to preserve the public fisc, conserve judicial resources, reduce the opportunity for inconsistent results in successive trials and diminish inconvenience to witnesses." Nitsche , quoting State v. Schaim , 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992).
*174 {¶ 30} However, if it appears that a defendant is prejudiced by joinder, the trial court may grant a severance under Crim.R. 14. A defendant seeking severance must " 'furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.' " State v. Hand , 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 166, quoting State v. Torres , 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981).
{¶ 31} The state may rebut the defendant's argument by showing: (1) there is no prejudice to the defendant from joinder because, in separate trials, the state could introduce evidence of the joined offenses as "other acts" under Evid.R. 404(B) ; or (2) the evidence of each crime joined at trial is "simple and direct" so it is unlikely that the jury could confuse the evidence pertaining to each of the offenses. Dean at ¶ 61 ; Nitsche at ¶ 89.
{¶ 32} Here, the offenses were alleged to be connected transactions that were parts of a common scheme or plan and part of a course of criminal conduct with a shared purpose, or scheme, and occurred over a short time, as contemplated by Crim.R. 8. The offenses alleged in both Case Nos. CR-15-595119 and CR-16-606156 involved Barfield and appellant. According to the state's evidence, each shooting explained and motivated the next. The state maintained that appellant set out to shoot Barfield, shot at him on January 24, 2015, killed him and others on February 5, 2015, then killed an eyewitness on June 4, 2015. In addition, the aggravated murder charges in Case No. CR-16-606156 set forth a course of conduct specification. Evidence in both matters included statements made by appellant and McKinney and weapons possessed by appellant and Barfield. Under Evid.R. 404(B), evidence from other shootings would have been admissible to prove appellant's identity as the shooter, as well as his plan and preparation. Therefore, there was no prejudice from the joinder. The evidence going to each crime was also simple and direct. It was unlikely that the jury would have confused the evidence pertaining to each offense, and the jury was able to consider each charge separately, because appellant was acquitted of the charges related to the January 22, 2015 shooting. Therefore, appellant was not denied his right to a fair trial.
{¶ 33} In accordance with the foregoing, we find no abuse of discretion, and the first assigned error is without merit.
II. Motion for Mistrial Related to Comment Directed Toward a Juror
{¶ 34} In the second assigned error, appellant asserts that the trial court erred in denying his motion for a mistrial in connection with a statement made to a juror's daughter at the juror's granddaughter's school, which was later brought to the attention of other jurors. In opposition, the state argues that the trial court questioned the jurors about this issue and did not err.
{¶ 35} "In cases involving outside influences on jurors, trial courts are granted broad discretion in * * * determining whether to declare a mistrial." State v. Herring , 94 Ohio St.3d 246, 259, 762 N.E.2d 940 (2002), quoting State v. Phillips , 74 Ohio St.3d 72, 89, 656 N.E.2d 643 (1995).
{¶ 36} The complaining party must show actual prejudice, i.e., he must show that the communication biased one or more jurors. Id. , citing Crim.R. 33(A), and State v. Keith , 79 Ohio St.3d 514, 526-527, 684 N.E.2d 47 (1997). A trial court may rely upon a juror's testimony as a basis for *175 finding that his or her impartiality was not affected. Herring.
{¶ 37} In Herring , a juror received a disturbing phone call during the course of the trial and discussed it with several other jurors. The court conducted a hearing pursuant to Remmer v. United States , 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), to ascertain the impact upon the jurors and determine whether their partiality was affected by the incident. The jurors testified that the incident would not affect his or her verdict. The court determined that the call did not impact the jurors' impartiality, and the Supreme Court affirmed. The court concluded that the trial court could rely upon the jurors' testimony, and did not abuse its discretion in denying the defendant's motion for a mistrial.
{¶ 38} Here, juror No.1 indicated that during the presentation of the state's case, a woman approached her daughter at her granddaughter's school, requesting that the juror "go easy on her play son." The juror's daughter said that she could not discuss the incident, but the woman continued and "kept going on and said, 'it only takes one of them' to get him off.' " Before informing the court, juror No. 1 asked other jurors what to do. She did not want to speak in front of appellant and was fearful of remaining on the jury. The trial court permitted the attorneys to question juror No.1, then excused her.
{¶ 39} The court held a Remmer hearing in open court during which the incident was raised with the entire panel. Each of the other jurors and alternate jurors were individually voir dired under oath about the incident. During this individual questioning, the jurors were all questioned by the court and the attorneys about their awareness of the incident, whether they could remain impartial, and whether they could proceed without being influenced by the contact directed toward juror No.1. Each of the jurors spoke. Some candidly told the judge that they had gotten "anxious," "worried," "concerned," or "paranoid" due to the incident, but others either knew little of the incident or experienced no impact from it. One alternate juror thought the comment came from an individual affiliated with appellant. However, the jurors ultimately indicated that they could remain on the panel, would be impartial, and follow the law during their deliberations.
{¶ 40} Following the voir dire, the court provided the attorneys with an opportunity to argue the matter. After that, the court instructed the jury as a group that appellant was presumed innocent and that the burden of proof remained with the state. At that point, the court asked each of the jurors whether they could disregard the incident, proceed without bias, and decide the case solely upon the evidence. Finally, the court gave the jury a cautionary instruction to disregard any "discussion, observation, perception" about the incident as well as any "inherent bias," and "directed and ordered [them] to decide this case * * * based solely upon the evidence."
{¶ 41} From all of the foregoing, the record demonstrates that the trial court did not err insofar as it determined that the contact would not impair the jurors' abilities to perform their duties, and did not err in denying the motion for a mistrial.
III. Motion for Mistrial Related to Comment from Witness
{¶ 42} Appellant next argues that the trial court erred in refusing to grant a mistrial after Perkins stated during his direct examination that "The Terminator" approached him and told him to "change his testimony." Appellant asserts that he was not informed of this contact prior to trial. In opposition, the state argues that this information is referred to in appellant's *176 August 19, 2016 telephone call from appellant to "Wayne." In the call, appellant issues instructions that "The Terminator" should inform Perkins that Kennedy was the person who committed the barbershop shooting. The state also states that it orally informed the defense of the contact, a claim the defense denies.
{¶ 43} The granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. State v. Iacona , 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001), citing State v. Sage , 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987).
{¶ 44} Under Crim.R. 33, a new trial may be granted on the grounds of, inter alia, "irregularity in the proceedings" that deprived the defense of a fair trial, or surprise that materially affected his substantial rights.
{¶ 45} A new trial may also be warranted under Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), where there has been a due process violation due to suppression of evidence favorable to an accused where the evidence is material either to guilt or to punishment. State v. Brown , 186 Ohio App.3d 309, 2010-Ohio-405, 927 N.E.2d 1133, ¶ 35 (7th Dist.). Brady evidence includes evidence bearing on the credibility of the state's witnesses. See Giglio v. United States , 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, such evidence "shall be deemed material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." State v. Johnston , 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph five of the syllabus. The defendant carries the burden to prove a Brady violation rising to the level of a denial of due process. State v. Glover , 2016-Ohio-2833, 64 N.E.3d 442, ¶ 35 (8th Dist.), citing State v. Kulchar , 4th Dist. Athens No. 10CA6, 2015-Ohio-3703, 2015 WL 5313080, ¶ 42, and Iacona at 92, 752 N.E.2d 937.
{¶ 46} In this matter, the taped jail discussions indicate that appellant instructed that "The Terminator" contact Perkins and explain that Kennedy was the barbershop shooter. This discovery was provided to the defense. Later, during his testimony at trial, Perkins stated that "The Terminator" did in fact speak with him about changing his testimony. The defense complained that it did not know that contact actually occurred after the phone call. The state explained that Perkins revealed this information to them shortly before trial and they orally informed the defense, but there was no police report documenting this contact. The defense denied that they were informed of the contact, and the trial court offered the defense additional time to prepare and also offered to provide a curative instruction. The defense declined both offers. The court subsequently permitted the defense to voir dire Perkins outside the presence of the jury. Perkins identified "The Terminator" as his friend Lavelle Ramsey and further explained that Ramsey did not want anything to do with the matter and stated that Perkins should not change his testimony. The defense cross-examined Perkins the following day.
{¶ 47} Our review of the record indicates that the trial court properly denied the motion for a mistrial. Although there was some dispute as to whether the state informed the defense that "The Terminator" actually contacted Perkins, the record demonstrates that the contact was discussed in jail calls that were provided to the defense. Moreover, we do not find the testimony regarding the contact from "The Terminator" to undermine the outcome of the trial, because Perkins later clarified that Ramsey is his best friend, and that *177 Ramsey did not wish to be involved and did not care about the matter. Overall, there is no reasonable probability that the disputed information would have made the difference between conviction and acquittal in this case.
{¶ 48} In accordance with all of the foregoing, we conclude that the trial court did not err in denying the motion for a mistrial. This assigned error is without merit.
IV. Admission of Ladson's Statement to Police
V. Statement from Ladson's Tablet
{¶ 49} In his fourth assigned error, appellant argues that the trial court erroneously admitted evidence of Ladson's statements to police, which contained appellant's alleged remark, "I spared you." He argues that the ruling was erroneous under Evid.R. 804(B)(6), that it deprived him of his right of confrontation, and that it was not admissible under the doctrine of forfeiture by wrongdoing.
{¶ 50} In his fifth assigned error, appellant argues that the trial court erred in permitting Shirley Ladson to read a statement she discovered on Ladson's tablet that identified appellant as the barbershop shooter and also expressed Ladson's fear and sadness over losing his brother. Appellant argues that the letter is inadmissible hearsay and was not admissible under Evid.R. 403(B).
{¶ 51} In opposition to both arguments, the state maintains that the evidence did not violate the confrontation clause and was admissible under the rules of evidence.
A. Confrontation Clause
{¶ 52} As to Ladson's statements to police, we apply the de novo standard of review to evidentiary rulings involving the Confrontation Clause. State v. McKelton , 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97.
{¶ 53} The Sixth Amendment to the United States Constitution guarantees an accused the right "to be confronted with the witnesses against him." In general, it is a violation of the Confrontation Clause to admit "testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had a prior opportunity for cross-examination." Crawford v. Washington , 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, Crawford explicitly held that confrontation claims are extinguished on equitable grounds where the accused's own misconduct is responsible for a witness's unavailability. Id. at 62, 124 S.Ct. 1354. See also Hand , 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 105. This exception is purely equitable and does not purport to be an alternative means of determining the reliability of the statement. Crawford.
{¶ 54} In Hand , this equitable exception to the Confrontation Clause was applied to permit numerous statements from a decedent regarding his anticipated receipt of money, and his plan to "take someone out" for defendant. After making this plan, the decedent was killed by the defendant "for the purpose of preventing his testimony as a witness." The court held that the statements were admissible, stating:
The trial court's preliminary determination that Welch's statements were admissible included a finding that Hand killed Welch to eliminate him as a potential witness. Indeed, Hand admitted to Grimes that he killed Welch to achieve that purpose (i.e., prevent him from being a witness against him). Thus, Hand forfeited his right to confront Welch because his own misconduct caused Welch's unavailability. See United States v. Garcia-Meza (C.A.6, 2005), 403 F.3d 364, 369-370 (defendant forfeited his *178 right to confront his wife because his wrongdoing, i.e., his murder of her was responsible for her unavailability).
Id. at ¶ 106.
{¶ 55} Similarly, in this matter, the court heard evidence that Ladson was parked outside the barbershop and the shooter stopped near his car before fleeing. Shortly after the shooting, appellant called Ladson and threatened to kill him for "saying his name" as the suspect. As appellant sought additional information from McKinney about the witness against him, McKinney stated that it was Ladson and also provided Kennedy with Ladson's whereabouts. In a home invasion a few houses away from Ladson's grandmother's residence, the assailants asked for "Pug." The next morning, Ladson was gunned down in the driveway of the address provided to Kennedy.
{¶ 56} From all of the foregoing, the trial court properly ruled that Ladson's statements, including that appellant said "I spared you," as he fled the barbershop were admissible. Appellant forfeited his right to confront Ladson because his own misconduct was designed to cause, and did cause, Ladson's unavailability.
B. Evid.R. 804(B)(6)
{¶ 57} Under Evid.R. 804(B)(6), a statement offered against a party is not excluded by the hearsay rule "if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying." To be admissible, the "offering party must show (1) that the party engaged in wrongdoing that resulted in the witness's unavailability, and (2) that one purpose was to cause the witness to be unavailable at trial." Id. ; Hand , 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 84, citing United States v. Houlihan , 92 F.3d 1271, 1280 (1st Cir.1996). We review the trial court's determination of admissibility under Evid.R.804(B)(6) for an abuse of discretion. Hand at ¶ 92.
{¶ 58} In this matter, the evidence demonstrated both that appellant engaged in wrongdoing that resulted in Ladson's unavailability and that he did so with purpose to cause Ladson to be unavailable as a witness against him in the barbershop shooting case. Therefore, we conclude that the trial court did not abuse its discretion in admitting this statement under Evid.R. 804(B)(6).
C. Ladson's Letter
{¶ 59} Shirley Ladson was permitted to read a statement that Ladson wrote on his tablet, identifying appellant as the barbershop shooter and explaining his fear and sadness at losing his brother.
{¶ 60} In determining whether the statement was admissible under Evid.R. 403(B), we review for an abuse of discretion. State v. Smith , 50 Ohio App.2d 183, 197, 362 N.E.2d 1239 (8th Dist.1976).
{¶ 61} The record indicates that after Ladson wrote the statement, he showed Shirley and asked her what she thought about it. She sent it to police after Ladson was murdered, and it was probative of the investigation. Moreover, the trial court did not abuse its discretion in determining that its probative value was not outweighed by the danger of unfair prejudice, confusion, or undue delay.
{¶ 62} These assigned errors lack merit.
VI. Ineffective Assistance of Counsel
{¶ 63} In his sixth assigned error, appellant asserts that he was denied his right to the effective assistance of counsel because his trial attorneys did not seek a change of venue, did not hire a defense DNA expert, did not present an alibi, and did not challenge Jameel Bell's competency.
*179 {¶ 64} We review a claim of ineffective assistance of counsel under a two-part test that requires the defendant to demonstrate: (1) trial counsel's performance fell below an objective standard of reasonable representation; and (2) prejudice arose from the deficient performance. State v. Bradley , 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
{¶ 65} In evaluating the alleged deficiency in performance, our review is highly deferential to counsel's decisions because there is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Bradley at 142-143, 538 N.E.2d 373, citing Strickland at 689, 104 S.Ct. 2052. Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts are to refrain from second-guessing the strategic decisions of trial counsel. State v. Carter , 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Debatable trial tactics generally do not constitute a deprivation of effective counsel. Dean, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 288.
{¶ 66} To show prejudice, a defendant must prove that the lawyer's deficiency was so serious that there is a reasonable probability the result of the proceeding would have been different. Strickland at 694, 104 S.Ct. 2052.
A. Change of Venue
{¶ 67} Crim.R. 18(B) does not require a change of venue merely because of extensive pretrial publicity. State v. Treesh , 90 Ohio St.3d 460, 463, 739 N.E.2d 749 (2001) ; State v. Landrum , 53 Ohio St.3d 107, 116-117, 559 N.E.2d 710 (1990). "A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased." Treesh at 463, 739 N.E.2d 749. The Ohio Supreme Court has recognized that counsel could have reasonably decided not to request a change of venue where "voir dire about pretrial publicity was adequate." State v. Davis , 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 49 ; State v. Diar , 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 228-229.
{¶ 68} In this matter, there was pretrial publicity but it was the subject of juror questionnaires and there was extensive voir dire on this topic. Moreover, the record does not indicate that jurors were biased due to the publicity. Defense counsel could have reasonably decided not to request a change of venue and did not err in this regard.
B. Defense DNA Expert
{¶ 69} The Ohio Supreme Court has held that the failure to call a defense DNA expert and to instead rely on cross-examination does not constitute ineffective assistance of counsel. State v. Nicholas , 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993), citing State v. Thompson , 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407 (1987). Counsel's decision to rely on cross-examination of the state's DNA expert may be a legitimate tactical decision because the results of defense DNA testing might not have turned out to be favorable to the defense. See State v. Foust , 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 97 ; State v. Hartman, 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (2001).
{¶ 70} Accordingly, defense counsel did not err in failing to hire a DNA expert.
C. No Alibi Defense
{¶ 71} In State v. Jones , 8th Dist. Cuyahoga No. 63836, 1993 WL 389457 (Sept. 30, 1993), this court noted that the "exclusion of alibi evidence is not always a violation of an essential duty." It is not ineffective where the defendant does not show that he had a valid alibi defense.
*180 State v. Mallory , 2d Dist. Montgomery No. 16543, 1998 WL 380502 (July 10, 1998). Moreover, it is not ineffective to refrain from presenting alibi evidence that conflicts with other prior defense statements. State v. Coleman , 2d Dist. Clark No. 2001-CA-42, 2002-Ohio-5377, 2002 WL 31242241, ¶ 22.
{¶ 72} Here, the record indicates that the state was aware of a statement that appellant's mother had made regarding appellant's "potential alibi." In light of the state's awareness of a claimed alibi, defense counsel may have reasonably refrained from providing evidence of alibi.
D. Competency of Jameel Bell
{¶ 73} Appellant next argues that trial counsel was ineffective in failing to challenge Jameel Bell's competency to identify the assailant because he has Down Syndrome.
{¶ 74} The record demonstrates that Bell graduated from high school and worked at the barbershop and other nearby businesses. Bell described the barbershop, its customers, and the events that took place during the shooting. He stated that he understands the importance of telling the truth. He indicated that he "spoke" with his mother, who is deceased, before making the identification, but the record indicates that he is very spiritual and that he talks to his parents in his nightly prayers. Bell provided conflicting details as to the length of the shooting and whether the shooter wore a hat, but he stated that he could see the shooter's face. He identified appellant in a photo array and again in trial. From the foregoing, Bell was capable of receiving just impressions of the facts and relating them truthfully as required under Evid.R. 601. There is nothing in the record to support the claim that Bell was incompetent to testify. Trial counsel did not err in failing to challenge his competency.
{¶ 75} The sixth assigned error is without merit.
VII. Appellant's Mother's Presence in the Courtroom
{¶ 76} In the seventh assigned error, appellant complains that the state misrepresented that his mother would be a witness in order to exclude her from the courtroom under the separation order. He additionally complains that the trial court erred in barring his mother from the courtroom. In opposition, the state notes that it did call appellant's mother as a witness, and that although the court removed her due to her conduct, she was not permanently barred from attending the trial.
A. Separation of Witnesses
{¶ 77} Under Evid.R. 615, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses. Generally, the separation of witnesses is a matter within the discretion of the trial court. Oakwood v. Makar , 11 Ohio App.3d 46, 48, 463 N.E.2d 61 (8th Dist.1983).
{¶ 78} Here, as to the issue of whether the state misrepresented that appellant's mother would be a witness, we acknowledge that there was an order for separation of witnesses, and the prosecuting attorney stated that he feared that appellant's mother's true purpose in being present in court was to "cause trouble." However, the state presented evidence that she was on its witness list due to jail calls to her involving a potential alibi and her attempts at contacting a witness. In any event, appellant's mother was in fact called as a witness, and she invoked her right to remain silent. Therefore, there was no error in connection with the separation order or appellant's mother's name on the state's witness list.
*181 B. Excluding Appellant's Mother From Courtroom
{¶ 79} The Sixth Amendment guarantees the right to a public trial. However, the right to an open trial may give way where a party advances an overriding interest that is likely to be prejudiced, the closure is no broader than necessary to protect that interest, the trial court considers reasonable alternatives, and the court makes findings to support the closure. See State v. Sowell , 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 28, citing Waller v. Georgia , 467 U.S. 39, 46-47, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984).
{¶ 80} Here, the record indicates that the state believed that appellant's mother may have had involvement in contacting juror No.1, and the state also complained that she had made inappropriate gestures during trial. The court subsequently removed appellant's mother from the courtroom. However, the court reminded the parties that closure of a courtroom is "a matter of constitutional magnitude." The court did not bar appellant's mother from returning, and informed her that there were no orders barring her from returning.
{¶ 81} In accordance with the foregoing, this assigned error lacks merit.
VIII. Barbershop Crime Scene Photos
IX. Autopsy Photos of the Deceased
{¶ 82} In his eighth assigned error, appellant argues that the trial court erred in admitting gruesome photographs of the barbershop crime scene. In the ninth assigned error, he maintains that the court erred in admitting cumulative and prejudicial autopsy photos of Barfield and Ladson. In opposition, the state argues that the photos were properly admitted because they are probative of the shooter's intent and the circumstances of the crimes.
{¶ 83} Decisions on the admissibility of photographs are left to the sound discretion of the trial court. State v. Lang , 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 138 ; State v. Slagle , 65 Ohio St.3d 597, 601, 605 N.E.2d 916 (1992).
{¶ 84} "To be admissible in a capital case, the probative value of each photograph must outweigh the danger of prejudice to the defendant and, additionally, not be repetitive or cumulative in nature." State v. DePew , 38 Ohio St.3d 275, 281, 528 N.E.2d 542 (1988), citing State v. Morales , 32 Ohio St.3d 252, 258, 513 N.E.2d 267 (1987). "The term 'gruesome' in the context of photographic evidence should, in most cases, be limited to depictions of actual bodies or body parts." Id. "[P]hotos of blood stains * * * do not have a shock value equivalent to a photograph of a corpse." Id. Further, in capital cases, nonrepetitive photographs, even if gruesome, are admissible as long as the probative value of each photograph substantially outweighs the danger of material prejudice to the accused. Lang at ¶ 139. A "gruesome" photograph may also be admissible where it depicts the intent, manner and circumstances of death. Id. at ¶ 140 ; State v. Craig , 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 92.
A. Crime Scene Photos
{¶ 85} With regard to the 176 crime scene photographs, we note that the exhibits were admitted without objection. Appellant has waived all but plain error with respect to those exhibits. State v. Trimble , 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 132.
{¶ 86} In this case, Gonzalez and Brandon were transported from the crime scene for treatment, and only Barfield's body is depicted in the crime scene photographs. Of the 176 photos, the overwhelming majority of the photos depict the barbershop, *182 damage done from bullets, bullet casings, and items in disarray from the attack. Another group depicts the blood evidence. A small group depicts all or part of Barfield's body, and several depict the final close range injuries he sustained and include a large volume of blood. Generally, each photograph depicts a different aspect of the crime. We find neither abuse of discretion nor plain error in connection with these photos.
B. Autopsy Photos
{¶ 87} In Craig , the court held that autopsy photos depicting an abrasion, neck injuries and ligature marks on the victim's neck were admissible because they were probative of the manner of death and Craig's specific intent to kill. Craig , 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, at ¶ 93. In Lang , the autopsy photographs, though gruesome, were admissible because they supported the coroner's testimony and provided a perspective of the victims' wounds. Lang , 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 142.
{¶ 88} In this matter, the disputed autopsy photos depict Ladson's head, with abrasion's to his nose, and Barfield's neck and torso, with four wounds arcing across his chest. Though body parts are depicted, the photos depict the victims' wounds and demonstrate the manner of death. Their probative value is not outweighed by prejudicial effect. Therefore, we find no abuse of discretion in connection with admission of these photos.
{¶ 89} The eighth and ninth assignments of error are without merit.
X. Expert Testimony of Jonathan Gardner
{¶ 90} Appellant argues in his tenth assigned error that the trial court erred in failing to conduct a Daubert hearing regarding the ballistics and firearms testimony of Ohio Bureau of Criminal Investigation ("OBCI") firearms witness Jonathan Gardner ("Analyst Gardner").
{¶ 91} The admissibility of expert testimony is a matter left to the discretion of the trial court, so we review for an abuse of that discretion. State v. Drummond , 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 114. "Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met." State v. Nemeth , 82 Ohio St.3d 202, 207, 694 N.E.2d 1332 (1998).
{¶ 92} In Daubert , the United States Supreme Court held that the trial court must act as a "gatekeeper" to ensure both the relevance and reliability of expert scientific testimony before admitting it. Daubert v. Merrell Dow Pharmaceuticals, Inc. , 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In Miller v. Bike Athletic Co. , 80 Ohio St.3d 607, 687 N.E.2d 735 (1998), the court adopted the Daubert factors for determining reliability and stated:
In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance.
Id. at 611, 687 N.E.2d 735.
{¶ 93} We note that the scientific basis for comparative ballistics analysis has received increased scrutiny in recent years. State v. Langlois , 2013-Ohio-5177, 2 N.E.3d 936 ¶ 21. However, that does not render firearms examination analysis "junk science" and does not impact the existing legal standards for admission of expert testimony in this field. Id. at ¶ 25-26.
{¶ 94} In this matter, although the trial court did not conduct a Daubert hearing *183 per se, it did require the state to present testimony to qualify Analyst Gardner in the manner described under Miller before it determined that he was an expert. Analyst Gardner indicated that he graduated from the Firearms Academy, took year-long training, and has worked in the area of firearms examination for 17 years. He conducted ballistics and tool mark analyses in thousands of cases, belongs to various professional associations, and subscribes to professional journals. He has been declared an expert in numerous prior trials. Further, Analyst Gardner testified to his methodology and also had a second examiner review his results.
{¶ 95} In accordance with all of the foregoing, we find no abuse of discretion in connection with the admission of this testimony.
XI. Expert Testimony from Dwayne Duke
XII. Text Messages from Lawrence Kennedy's Phone
{¶ 96} In the 11th assigned error, appellant argues that the trial court erred when it qualified Cleveland Police Detective Dwayne Duke ("Det. Duke") as an expert in mobile and computer analysis extractions. He complains that mobile forensics is not a science, that Det. Duke was not properly qualified, and that the trial court committed plain error in failing to hold a hearing under Daubert, 509 U.S. at 597, 113 S.Ct. 2786, 125 L.Ed.2d 469.
{¶ 97} In the 12th assigned error, appellant complains that the trial court erred in admitting Kennedy's text messages into evidence because the statements constitute inadmissible hearsay.
A. Detective Duke's Testimony
{¶ 98} In State v. Calhoun , 8th Dist. Cuyahoga No. 105442, 2017-Ohio-8488, 2017 WL 5192435, this court held that testimony concerning an officer's training and experience with Cellebrite software and hardware and his extraction of data from a cell phone through Cellebrite was properly admitted. In that case, the trial court qualified the officer as an expert and permitted him to testify as to the data extracted from a phone. This court determined that the trial court did not abuse its discretion in admitting the evidence, stating:
Moreover, even if the trial court should not have permitted Officer Johnson to give expert testimony regarding the cell phone extractions, it could have permitted him to give lay witness testimony.
* * *
Our review of the record reveals that the state properly laid a foundation for Officer Johnson's testimony and that his testimony was directly related to the actions that he personally undertook in the investigation. Specifically, Officer Johnson testified to his training and experience through Cellebrite. He obtained a master certification from the company as a Cellebrite certified mobile examiner. He said that he was one of the first 25 people in the world to obtain a master certification from them. Therefore, Officer Johnson's testimony-that the 20 relevant images extracted from the female's phone were "associated" with the Extended Stay hotel in Westlake-was based on his own personal knowledge and experience as established by the state. Additionally, Officer Johnson's testimony related specifically to his own forensic analysis and report. Further, Officer Johnson's testimony was helpful to determine a fact in issue-where the images were taken. Accordingly, the trial court did not abuse its discretion in allowing him to testify on these matters.
Id. at ¶ 32-36. Parenthetically, we note that similar evidence was also admitted in *184 State v. Durham , 2016-Ohio-691, 60 N.E.3d 552 (8th Dist.), and State v. McMiller , 8th Dist. Cuyahoga No. 103962, 2016-Ohio-5844, 2016 WL 4979497.
{¶ 99} In this matter, Det. Duke testified that he has received certificates and training in computer mobile forensics examinations. He specializes in cell phone and computer forensic data extractions, using Cellebrite hardware and software, and generates reports outlining this data. The defense did not request a Daubert hearing, but rather, complained that Det. Duke was not an expert because he was merely providing fact-based testimony about the content of the cell phone and not expert opinions. The trial court determined that he is an expert and permitted him to testify to the data extractions that were also outlined in his report. In accordance with Calhoun , we find no abuse of discretion.
B. Kennedy's Text Messages
{¶ 100} Det. Duke testified that he downloaded the content of Kennedy's phone. He authenticated his written extraction report of dates, times, and contents of Kennedy's text messages. These included Kennedy asking for an address and receiving the address where Ladson was staying, as well as "done," and "checkmate," and statements regarding flight from police. The state provided the defense with notice of intent to introduce the statements under Evid.R. 801(D)(2)(e).
{¶ 101} Under Evid.R. 801(D)(2)(e), "[a] statement is not hearsay if * * * the statement is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." Text messages are included as "statements" within the meaning of Evid.R. 801(D)(2)(e). See United States v. Thompson , 568 Fed. Appx. 812, 817-818 (11th Cir.2014) ; United States v. Brown , 667 Fed. Appx. 567, 568 (8th Cir.2016).
{¶ 102} In order to establish independent proof of a conspiracy, the prosecution must prove:
(1) of the existence of a conspiracy; (2) of the defendant's participation in the conspiracy; (3) of the declarant's participation in the conspiracy; (4) that the statement was made during the course of the conspiracy; and (5) that the statement was made in furtherance of the conspiracy.
State v. Baker , 137 Ohio App.3d 628, 653, 739 N.E.2d 819 (12th Dist.2000).
{¶ 103} In this matter, the state made the requisite showing under Evid.R. 801(D)(2)(e). The text messages were properly admitted.
{¶ 104} The eleventh and twelfth assigned errors lack merit.
XIII. Testimony From Detective Johnson Regarding a Dispute Over a Gun
{¶ 105} In his 13th assigned error, appellant asserts that the trial court erred in permitting Cleveland Police Det. Johnson to testify regarding a dispute that Barfield and appellant had on a party bus on New Year's 2015, and he complains that Det. Johnson had no personal knowledge of such dispute.
{¶ 106} A law enforcement officer's statements offered into evidence to explain the officer's next investigative step are generally not hearsay. State v. Dye , 8th Dist. Cuyahoga No. 103907, 2016-Ohio-8044, 2016 WL 7158739, ¶ 39, citing State v. Thomas , 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980).
{¶ 107} Here, Det. Johnson testified that in the course of his investigation into the Robinson shooting and the other shootings, he learned the appellant, Barfield, *185 and others had celebrated on a party bus in January 2015 and that there was a feud between appellant and Barfield over a weapon. Det. Johnson's testimony also outlined the manner in which he learned appellant's phone number as well and the interrelationships of the parties. The trial court did not err in admitting this testimony.
{¶ 108} This assigned error lacks merit.
XIV. Testimony Regarding Meaning of the Term "Holla"
{¶ 109} Appellant next argues that the trial court violated Evid.R. 403 when it permitted Det. Johnson, of the Gang Impact Unit, to testify that the term "holla" could mean "to speak," or "to kill."
{¶ 110} This claim is reviewed for an abuse of discretion. Smith , 50 Ohio App.2d at 197, 362 N.E.2d 1239. In State v. Barnett , 10th Franklin Dist. No. 92AP-345, 1992 WL 246000 (Sept. 22, 1992), the court stated:
[A] police officer is permitted to testify concerning his knowledge and experience as to the behavioral and language patterns of people commonly observed on the streets, including people associated with criminal activities, in a manner helpful for the jury's clear understanding of the factual issues involved.
See also Drummond , 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 120 (testimony about gang-related matters was derived from knowledge and experience and was not erroneously admitted); State v. Carter , 2017-Ohio-7501, 96 N.E.3d 1046 ¶ 89 (officer's testimony regarding slang terminology is permissible); State v. Scott , 10th Dist. Franklin No. 90AP-255, 1990 WL 140548 (Sept. 27, 1990) (police officer's testimony about meaning of slang terminology was not erroneous); State v. Johnson , 7th Dist. Jefferson No. 13 JE 5, 2014-Ohio-1226, 2014 WL 1326107, ¶ 62 ( (police officer's testimony about gang tattoos was not erroneous).
{¶ 111} In this matter, the court recognized Det. Johnson as an expert on gangs in the Cleveland area. He testified that generally, the term "holla" means to "talk," but depending upon the context, it could also mean to "kill." Det. Johnson's testimony regarding the two possible meanings of the term "holla" was derived from knowledge and experience and was not erroneously admitted.
{¶ 112} Additionally, Det. Johnson's testimony was relevant and probative of the discussions that took place in this matter. Moreover, the probative value of this evidence was not outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.
{¶ 113} The trial court did not abuse its discretion in admitting this evidence.
XV. Flight Instruction
{¶ 114} Appellant next argues that the trial court committed prejudicial error by giving a "flight instruction" because there was no evidence that he fled to avoid apprehension and he was arrested without incident. In opposition, the state argues that the charge properly instructed that departure from the scene should only be considered if the jury determined that it was motivated by consciousness of guilt.
{¶ 115} We review a trial court's issuance of a jury instruction for an abuse of discretion. State v. Williams , 8th Dist. Cuyahoga No. 90845, 2009-Ohio-2026, 2009 WL 1156678, ¶ 50. Further, jury instructions are reviewed in their entirety to determine if they contain prejudicial error. State v. Fields , 13 Ohio App.3d 433, 436, 469 N.E.2d 939 (8th Dist.1984).
{¶ 116} Flight from justice means escape or affirmative attempt to avoid apprehension.
*186 State v. Potts , 8th Dist. Cuyahoga No. 104482, 2017-Ohio-4435, 2017 WL 2691296, ¶ 49, citing State v. Wesley , 8th Dist. Cuyahoga No. 80684, 2002-Ohio-4429, 2002 WL 1986545, ¶ 19. " '[A] mere departure from the scene of the crime is not to be confused with deliberate flight from the area in which the suspect is normally to be found.' " State v. Santiago , 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, 2011 WL 2519507, ¶ 30, quoting State v. Norwood , 11th Dist. Lake Nos. 96-L-089 and 96-L-090, 1997 WL 663423 (Sept. 30, 1997). The instruction is predicated upon evidence that the defendant "fled to a situs where he could not have been easily located." Potts ; State v. Johnson , 8th Dist. Cuyahoga No. 99715, 2014-Ohio-2638, 2014 WL 2809013, ¶ 109, citing Norwood .
{¶ 117} In this matter, the jury was charged that:
You are instructed that the fact that the defendant fled does not raise a presumption of guilt. It may tend to indicate the defendant's consciousness of guilt. If you find that the facts do not support that the defendant fled the scene, or if you find some other motive prompted the defendant's conduct, or if you are unable to decide what the defendants motivation was, then you should not consider this evidence for any purpose. If, however, you do find that the facts support that the defendant engaged in such conduct, and if you decide that the defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that evidence[.]
{¶ 118} Here, the record indicates that the shooter ran from the scene. He fled into the street and used his gun to gesture the cars to proceed through a red light as he ran across the street. The evidence also indicated that appellant could not be located at his former residence. Police unsuccessfully searched for him at his mother's home and his brother's home before utilizing electronic surveillance to determine that he was hiding at the home of an individual with no gang affiliation. Law enforcement negotiators spoke with appellant, and he exited the house.
{¶ 119} On the basis of this record and the balanced language employed by the court, we find no abuse of discretion in connection with the flight instruction.
XVI. Weight of the Evidence
{¶ 120} Appellant next argues his convictions are against the manifest weight of the evidence.
{¶ 121} In State v. Wilson , 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:
The criminal manifest-weight-of-the-evidence standard was explained in State v. Thompkins (1997), 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. In Thompkins , the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. Id. at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. Id. at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive-the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. Id. at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as *187 a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Id. at 387, 678 N.E.2d 541, citing Tibbs v. Florida (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.
Id. at ¶ 25.
{¶ 122} An appellate court may not merely substitute its view for that of the factfinder, but must find that " 'in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins at 387, 678 N.E.2d 541. Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case that the evidence weighs heavily against the conviction." Id.
{¶ 123} In this matter, appellant's admissions linked him to the January 20, 2015 shooting of Robinson. Appellant's cell phone was also in the area of the shooting. The state presented extensive evidence tying appellant to the February 5, 2015 barbershop shooting. This included eyewitness testimony from Evans, Perkins, Wright, and Ladson, as well as appellant's DNA on shell casings. The state's evidence also indicated that appellant and Barfield shot at each other in the January 24, 2015 shooting. One of the weapons used by the barbershop assailant was also used in the January 24, 2015 shooting, as was Barfield's .45-caliber Rock Island Armory weapon. Appellant's cell phone was also in this general area.
{¶ 124} The state's evidence also indicated that appellant contacted Ladson immediately after the shooting and threatened him for "saying his name" as the shooter. Appellant then tried to determine if Ladson made a statement to police. He discussed the matter with McKinney, who also accused Ladson of being a snitch. McKinney and Kennedy discussed Ladson's whereabouts and in a home invasion, a few houses away, the assailants were looking for "Pug." McKinney stated that he hoped that he would have "good news" for appellant, and Ladson was killed the next day. McKinney then asked if it was "done," and Kennedy said "Yes," and "Checkmate."
{¶ 125} From the foregoing, the jury did not lose its way in convicting appellant of the offenses. The convictions are not against the manifest weight of the evidence. This assigned error lacks merit.
XVII. Sufficiency of the Evidence
{¶ 126} In the 17th assigned error, appellant maintains that his convictions are not supported by sufficient evidence because there is no evidence linking him to the crimes.
{¶ 127} A challenge to the sufficiency of the evidence supporting a conviction requires the court to determine whether the prosecution has met its burden of production at trial. State v. Givan , 8th Dist. Cuyahoga No. 94609, 2011-Ohio-100, 2011 WL 198503, citing Thompkins , 78 Ohio St.3d 380, 678 N.E.2d 541. On review for sufficiency, courts are to assess not whether the prosecution's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. Id. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Vickers , 8th Dist. Cuyahoga No. 97365, 2013-Ohio-1337, 2013 WL 1384883, citing State v. Jenks , 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.
{¶ 128} This court has stated, "even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable *188 juror could find the eyewitness testimony to be credible." State v. Johnson , 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, 2014 WL 585043, ¶ 52, citing State v. Bryson , 8th Dist. Cuyahoga No. 98298, 2013-Ohio-934, 2013 WL 1089109.
{¶ 129} Within this assigned error, appellant asserts that the state did not present sufficient evidence to establish his identity as the shooter.
{¶ 130} The state presented appellant's statements in the phone calls from Bey to establish that appellant was Robinson's assailant in the January 20, 2015 shooting. These statements included that Robinson "tried to get up on me," and was also armed. Police also determined that appellant's phone was in the area.
{¶ 131} The state presented extensive evidence linking appellant to the February 5, 2015 barbershop shooting. Ladson observed appellant enter the barbershop then exit a short time later brandishing two weapons, and stating that he "spared" Ladson. Evans and Perkins identified appellant as the assailant with certainty. Wright described the assailant and later provided appellant's photo to the police. Sears also identified appellant as the assailant as part of his plea agreement. Cell phone evidence placed appellant in the vicinity of the barbershop. Additionally, Ladson spoke with police and made a statement identifying appellant as the assailant. Appellant's DNA was found on five shell casings found at the scene. According to the state's witness, the DNA was present though primary transfer, or actually touching the casings.
{¶ 132} Immediately following the barbershop shootings, appellant called Ladson. In a call overheard by Shirley Ladson, appellant telephoned Ladson and said,"[W]hy [are] you saying my name? I'm going to kill you." After Ladson went to the police, appellant was heard in jail phone calls trying to ascertain the identity of the witnesses against him and learned that Ladson had spoken to police. Kennedy then asked Kevin McKinney ("McKinney"), "text me da address." In response, McKinney sent the address where Ladson was staying with his grandmother. A home invasion occurred a few houses away from this address, and the assailants asked for Pug.
{¶ 133} The state's evidence also demonstrated that 25 of the 9 mm shell casings found at the scene of the January 24, 2015 shooting were fired from the same 9 mm weapon that the shooter used during the Chalk Linez shootings. The .45-caliber Rock Island Armory casings from this shooting were also linked to Barfield's weapon.
{¶ 134} From the foregoing, we conclude that the state presented sufficient evidence in all four shootings. This assigned error lacks merit.
XVIII. State's Witness List
{¶ 135} In his 18th assigned error, appellant argues that the state failed to provide a proper witness list in violation of Crim.R. 16(I) because, "the state listed an extraordinary number of witnesses who were not called." In opposition, the state indicates that the trial court requested a "comprehensive list" in order to probe any potential conflicts with jurors. In an abundance of caution and to avoid surprise to the defense, the state provided an expansive list. Later, the court requested that counsel "trim down" its list, and the state ultimately declined to call many of the listed individuals.
{¶ 136} Under Crim.R. 16(I), "[e]ach party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal."
*189 {¶ 137} We review claims involving Crim.R. 16(I) for an abuse of discretion. State v. Darmond , 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 33.
{¶ 138} In State v. Williams , Lucas C.P. No. G-4801-CR-0201102568-000, 2012 Ohio Misc. LEXIS 1528 (Apr. 17, 2012), the defendant maintained that the state had listed an "unrealistic" number of witnesses on its witness list in order to intentionally mislead or force the defense into lengthy pretrial investigations.
In rejecting this argument, the court stated:
The Court notes a third potential reason; that is, because unexpected issues can arise during a trial, and because a party can never be certain where a given line of questioning may lead, a party therefore can never be certain who will be needed in rebuttal or surrebuttal. As such, prudent counsel will provide an expansive list of witnesses since opposing counsel can object to the calling of a witness not listed.
The State has stated in its responsive pleading that it has provided open file discovery. Both defense counsel are experienced and certified to represent a capital defendant. It should not be unexpected that defense counsel "reasonably anticipate[d]" who the State will call at trial. Moreover, there has been no evidence presented that the State is intentionally "misleading" the Defendant by providing names of individuals who have no connection with this case.
{¶ 139} Likewise, in this case, the state was required to list all witnesses that it reasonably anticipated calling, and the record demonstrates that the court sought a "comprehensive list" in order to properly seat a jury. Yet the court endeavored to conduct the trial expeditiously, and also requested a shortened list. Moreover, there is no evidence that the state intentionally misled the defense by providing the large list. Additionally, we note that one individual who identified appellant in a photo array did not identify him in court and other witnesses stated that they did not wish to be involved in the prosecution. Accordingly, the trial court did not abuse its discretion in connection with this issue.
XIX. Cumulative Error
{¶ 140} Appellant next argues, in the 19th assigned error, that all of the above cumulative errors amounted to prejudicial error that deprived him of a fair trial.
{¶ 141} Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. State v. Hunter , 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132 ; State v. Garner , 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent. Id. ; State v. Brown , 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 48.
{¶ 142} In this matter, we find the doctrine of cumulative error inapplicable due to the absence of other errors.
XX. Prosecutorial Misconduct
{¶ 143} In the 20th assigned error, appellant asserts that the prosecuting attorney engaged in misconduct by displaying to the jury various statements in quotations, thereby suggesting that they were transcribed; disclosing 200 potential witnesses, while only calling 67; and keeping appellant's mother from the courtroom by including her on its witness list.
{¶ 144} In reviewing a claim of prosecutorial misconduct, we must determine *190 whether the comments and questions by the prosecution were improper and, if so, whether they prejudiced appellant's substantial rights. State v. Smith , 14 Ohio St.3d 13, 14-15, 470 N.E.2d 883 (1984) ; State v. Gapen , 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 92. The "touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " Gapen , quoting Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).
{¶ 145} In evaluating appellant's 7th and 18th assigned errors, we have previously reviewed the claims concerning the exclusion of appellant's mother from the courtroom under the separation order and the length of the state's potential witness list. We have determined that no error occurred on either matter. Likewise, neither matter presents a claim of prosecutorial misconduct.
{¶ 146} With regard to the matter of the quotation marks, the record indicates that during the state's closing argument, the court repeatedly cautioned the state from listing statements in quotation marks. The court's caution was a clear directive that the state had to show that it was making an argument and not using direct quotations. In light of the trial court's diligence in addressing this issue and remedying it, we find that the use of quotation marks was harmless.
{¶ 147} This assigned error is without merit.
XXI. Prior Calculation and Design
{¶ 148} In the 21st assigned error, appellant argues that the finding that he committed aggravated murder with prior calculation and design was against the manifest weight of the evidence and not supported by sufficient evidence.
{¶ 149} The term " 'prior calculation and design' " suggests advance reasoning to formulate the purpose to kill." State v. Walker , 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.2d 1124, ¶ 18. There is no bright-line test to distinguish between the presence or absence of prior calculation and design; each case depends upon its own facts. Id. at ¶ 19. Three factors have traditionally been considered:
"(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?' "
Id. at ¶ 20, quoting State v. Taylor , 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), quoting State v. Jenkins , 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976). The Walker court also noted that prior calculation and design may be found where the defendant threatened to obtain a weapon and kill his victim and later carried out that plan, and where the defendant shot the victim execution style. Id. at ¶ 21.
{¶ 150} In this matter, the evidence demonstrated that appellant knew Barfield and Ladson, and that his relationships with these individuals deteriorated. There was evidence of an earlier shooting involving both appellant and Barfield on January 24, 2015. In addition, the attack at the barbershop involved preparation and planning, with two weapons and multiple shots fired. This attack was not an instantaneous eruptions of events. At the conclusion of the attack on Barfield in the barbershop, appellant fired three shots into Barfield's head. Similarly, the attack on Ladson involved extensive planning in determining whether Ladson was a witness against appellant and Ladson's whereabouts. Ladson was killed in a hail of bullets, thwarting live in-trial testimony from this witness. From all of the foregoing, we conclude that there is sufficient evidence to support the *191 prior calculation and design determinations.
{¶ 151} This assigned error is without merit.
{¶ 152} Judgment is affirmed.
Errors Assigned By Counsel
I. The trial court erred when it granted the state's request for joinder of all of the indictments and denied appellant's motion for relief from prejudicial joinder. This violated Criminal Rule 14 and violated appellant's federal and state due process rights.
II. The trial court erred when it failed to grant a mistrial after a juror was threatened and all of the jurors were aware of the incident.
III. The trial court erred when it failed to grant a mistrial after a witness indicated that he was approached by a man named "Terminator" and asked to change his testimony.
IV. The trial court erred when it admitted the out-of-court statement of Aaron Ladson. This violated appellant's right to confront and cross-examine the witnesses against him and Evid.R. 804(B)(6).
V. The trial court erred when it allowed Ladson s mother to read Exhibit 783 which was a statement from Ladson to his mother regarding the identification of appellant as the shooter. This was inadmissible hearsay and its probative value was substantially outweighed by its danger of unfair prejudice.
VI. Appellant was denied his right to the effective assistance of counsel in violation of the Sixth Amendment and Article I, Section 10 of the Ohio Constitution.
VII. The trial court erred when it barred appellant's mother from the courtroom. The state misrepresented that she would be called as a witness against appellant.
VIII. The trial court committed plain error when it admitted all of Exhibits 1-176 which were gruesome photos of the barbershop crime scene.
IX. The trial court erred when it admitted cumulative and unduly prejudicial autopsy photos of the deceased.
X. The trial court erred when it did not conduct a Daubert hearing regarding the expert testimony of Jonathan Gardner who was qualified as an expert in firearm and tool markings.
XI. The trial court erred when it determined that Dwayne Duke was an expert witness in the field of mobile device forensics.
XII. The trial court erred when it admitted the hearsay text messages of Lawrence Kennedy through the testimony of Dwayne Duke.
XIII. The trial court erred when it admitted the hearsay testimony of Detective Al Johnson that there was a dispute over a gun between Barfield and appellant. Johnson did not have any personal knowledge of the alleged dispute.
XIV. The trial court erred when it admitted testimony that the term "holla" could have two possible meanings in gang parlance; to either speak to someone or to kill them. This testimony had little or no probative value and its prejudicial effect substantially outweighed any probative value.
XV. The trial court erred when it gave a flight instruction over the objection of defense counsel, when there was no evidence that appellant fled from any of the scenes.
XVI. The verdicts were against the manifest weight of the evidence.
XVII. The verdicts were not supported by sufficient evidence.
*192 XVIII. The trial court violated appellant's due process rights when it failed to require the state to fully and accurately disclose its witnesses.
XIX. The cumulative error in this trial denied appellant his right to a fair trial.
XX. There were acts of prosecutorial misconduct throughout the proceedings that denied appellant a fair trial.
XXI. The finding that the murders were made with prior calculation and design was against the manifest weight of the evidence and not supported by sufficient evidence.

See appendix.

Appellant was acquitted of all charges pertaining to the January 22, 2015 shooting outside John Adams High School.