[Cite as *State v. Dye*, 2016-Ohio-8044.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103907**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JAMAL DYE

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-594386-A

**BEFORE:**   McCormack, J., Keough, P.J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:**   December 8, 2016

**ATTORNEY FOR APPELLANT**

Nicole C. Longino
11811 Shaker Blvd., #420
Cleveland, OH 44120


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By:   Margaret Troia
Mahmoud Awadallah
Assistant Prosecuting Attorneys
1200 Ontario Street
Justice Center, 9th Floor
Cleveland, OH 44113

TIM McCORMACK, J.:

{¶1} Jamal Dye appeals from a judgment of the Cuyahoga County Court of Common Pleas that convicted him of murder and additional related offenses following a jury trial. Having reviewed the record and applicable law, we affirm his convictions.

{¶2} On March 8, 2015, James Gray held a party at his house on Linnet Avenue near West 105th Street in Cleveland. The partygoers consumed alcohol and used drugs into midnight. All night long, tension brewed between appellant Jamal Dye, 20, and James Gray, 25. The tension culminated in the shooting death of Gray ("victim") by Dye ("appellant") around 3:30 a.m.

{¶3} During the ten-day trial, the state's presented 19 witnesses. Seven individuals who attended the party that night testified, six for the state and one for the defense. Appellant also took the stand. He claimed he shot the victim in self-defense. The jury also viewed the house where the shooting took place.

{¶4} After a lengthy jury trial, the jury acquitted appellant of aggravated murder but found him guilty of murder. The jury also found him guilty of felonious assault and carrying a concealed weapon. The trial court sentenced appellant to 18 years to life.

**Testimony by the State's Witnesses**

{¶5} Of the state's witnesses who were at the party that night, most of them did not witness the shooting but testified to the conflict between appellant and the victim that precipitated the shooting. These witnesses' accounts of how the events of the evening

unfolded varied in details and were not entirely consistent with each other. There was, however, one eyewitness to the shooting, Elizabeth Torres, and she testified for the state as well.

**a. Testimony of Partygoers who Did Not Witness the Shooting**

{¶6} Harold Williams, a friend of the victim, testified that tension arose between appellant and the victim on the night of the incident over Williams's ex-girlfriend Idrijana Vajusi. When Vajusi arrived with her friend Monica Correa, Williams was not happy to see Vajusi at the party. He asked her to leave but she would not. Williams and Correa then went upstairs to engage in sex. Later, Williams told appellant about his sexual encounter with Correa and encouraged appellant to engage in sex with Vajusi as well as to take Vajusi away from the party. Appellant then left the party with the two women. Williams later called Vajusi on her phone but appellant answered the phone. Appellant told Williams to stop calling because he was "trying to fuck" and hung up the phone. Feeling disrespected, Williams called appellant back on Vajusi's phone again and Vajusi answered the phone. The two started to argue. Appellant got on the phone. Williams told appellant not to bring Vajusi back to the party and handed his phone to the victim. Appellant then argued with the victim, who was visibly angry. Despite Williams's request, appellant returned to the victim's house with the two women. The tension between appellant and the victim escalated. The victim asked appellant to leave, but appellant refused. The victim then challenged appellant to a fight in the basement. At that point, appellant left but hinted that he would return soon.

{¶7} Moments after, Williams heard gunshots erupting outside. He rushed to the side door trying to lock the door. Appellant used a black pistol to block the door from closing — Williams identified the gun as the same gun shown in the state's exhibit Nos. 177 and 178, photographs of appellant holding a gun on a prior occasion. Another partygoer and the victim's cousin, Mario Cargill, and appellant then struggled over the gun in the kitchen area. Both Cargill and appellant fell into a window. According to Williams, while appellant and Cargill struggled over the gun, the victim went upstairs to retrieve a shotgun, in an attempt to "calm" the situation.

{¶8} After both Cargill and appellant fell into the widow, Cargill wrestled appellant to the ground, while appellant still held the pistol in his hand. Either the victim or another individual by the nickname of "Tone" then ran in and kicked the pistol out of appellant's hand. Williams then ran out of the house to get away from the scuffle. While hiding, he heard gunshots 30 feet away. According to Cargill, who also testified, Williams grabbed the gun and took it with him when he ran out of the house.

{¶9} Both Idrijana Vajusi and Monica Correa testified. Vajusi testified that she and her friend Correa drove with appellant trying to get a bottle of liquor. Appellant then drove to his mother's house to switch cars before returning to the party. While she was in the basement, she heard a commotion on the first floor. She exited the house through the side door. While walking toward the front of the house, she heard a gunshot. She went inside to see the victim lying on the floor.

{¶10} Monica Correa testified that after she and Williams engaged in sexual conduct, she, Vajusi, and appellant left the party. The three drove around trying to obtain a bottle of liquor. Before they returned to the party, appellant switched the car he was driving with his mother's car. Back at the party, the three were met at the door by Williams and the victim, who were unhappy to see the return of appellant and Vajusi. Correa went to the basement to retrieve her purse. Five minutes later, while in the basement, she heard five gunshots going off, but could not recall whether the shots came from inside or outside the house.

{¶11} Mario Cargill, the victim's cousin, also testified about the events leading to the shooting. He testified that there had been past conflict between appellant and the victim. When he arrived at the party, the victim told him to be prepared for a fight between the victim and appellant. When appellant arrived with Vajusi and Correa, he acted disrespectfully by entering the house through the front door, brushing past Cargill's girlfriend Elizabeth Torres, which caused an argument between Cargill and appellant. At the request of Torres, the argument de-escalated. Later, Cargill saw appellant and victim in a heated argument and one of appellant's friends handed appellant a silver gun. According to Cargill, Cargill helped de-escalate the conflict at this time. Appellant and the victim then headed to the front porch, and the victim challenged appellant to a fight in the basement. Appellant and the victim returned to the house without a fight.

{¶12} Cargill then went into a bedroom with his girlfriend Elizabeth Torres and their baby. Thirty to forty minutes later, he heard the noises of a scuffle coming from the

kitchen area. He went to the kitchen and saw appellant and the victim struggling with each other against the window over a gun appellant was holding. It was not the silver gun he saw someone handing to appellant earlier, but a "Tec-9," a type of gun with which he was familiar. To stop the trigger from being pulled, Cargill grabbed the gun from appellant, but dropped it when the victim's dog came up and bit Cargill on the leg. At this point, Harold Williams picked up the gun and ran outside with the gun, while appellant and the victim continued to fight. Cargill went into a bathroom to check on his dog bite. While in the bathroom, he heard a gunshot. He rushed to the kitchen to find the victim lying on the ground. He then heard two or three gunshots coming from the outside. Cargill ran outside and jumped into his truck to look for appellant. He found appellant walking down the street holding the silver gun he had seen on the earlier occasion. Cargill pulled his truck in front of appellant, and the two fought with each other. Cargill asked appellant, "why did you kill my cousin?" Appellant put the gun to Cargill's head and said, "I'll kill you too." As the two struggled, they were pulled apart by others. Cargill returned to the house and was met by the police. Joseph Kapostasy, a neighbor, witnessed the struggle between appellant and Cargill in the street.

### b. Eyewitness Testimony

{¶13} While the other witnesses were only able to testify to the confrontations between appellant and the victim leading to the eventual shooting, Cargill's girlfriend Elizabeth Torres witnessed the shooting. Also, unlike the other witnesses, Torres

testified she did not consume any alcohol or use any drugs that night. She provided the following eyewitness account.

{¶14} Torres testified that, on the day of the incident, she and her baby were in the victim's home to spend time with Cargill, the baby's father. While in a first floor bedroom with Cargill and the baby, she heard gunshots erupting outside the house. Cargill left to find out what was going on. When Torres heard a second round of gunshots, Torres herself went outside to find out what was taking place. She saw appellant, the victim, and Cargill were all outside: the victim was holding a shotgun, and appellant was shooting a black gun in the air. All three men then ran back to the house. The victim went through the front door; appellant went through the side door; and Cargill ran toward the back of the house. Still outside the house herself, Torres then saw, through the front door, appellant shooting the victim as the victim walked into the kitchen. The victim fell to the floor. Torres did not observe any struggle between the two men prior to the shooting.

{¶15} Taneisha Smith, a former girlfriend of appellant, also testified for the state. She was not at the party. She testified that appellant came to her on the night of the incident and told her he was being "jumped" at a party and he killed "Juice" (the victim's nickname) in self-defense.

{¶16} The police did not find any weapons at the scene but retrieved some spent cartridge casings. Detective James Kooser, a firearms examiner from the forensic lab, testified that .380 caliber spent cartridge casings and 0.9 millimeter spent cartridge cases

were found outside the home. He also testified a .380 caliber bullet killed the victim. In addition, he testified that appellant appeared to be holding a "Intratech 9" in state's exhibit Nos. 177 and178 (photographs of appellant holding a gun), and that both the magazine in the photographs and the magazine recovered on scene had duct tape on the bottom.

{¶17} Dr. James Keep from the county's medical examiner's office testified that the victim died of a gunshot wound in the abdomen. Curtiss Jones, a supervisor in the county's trace evidence department, testified that the shot that hit the victim was fired in close proximity, from a foot or less away.

**Defense**

{¶18} The defense called Andre Barnes, a friend of appellant who was at the party that night. Barnes testified he never saw appellant with a weapon that night. He heard a commotion coming from the first floor while he was in the basement. He went upstairs and saw appellant on the ground surrounded by people who appeared to be stomping him; he got scared and ran from the house.

{¶19} Appellant took the stand and testified in his own defense. He gave a drastically different account of how the shooting occurred. He admitted he was drinking and smoking marijuana on the night of the incident. He also admitted shooting the victim, but claimed he acted in self-defense.

{¶20} Appellant testified that he left the victim's house party with the two women, Vajusi and Correa. When they returned to the party, he was approached by Harold

Williams, who was unhappy he brought Vajusi back. "Tone" approached him as well, and they got into an argument. Someone then tackled him, and he fell on the ground in the kitchen. Several people were kicking and stomping him, and going through his pockets. When he got up, Cargill and the victim "had guns in [his] face." Cargill was holding a shotgun; and the victim was holding a handgun. He held his hands up, saying "don't shoot me." His friend "Adam" then came into the kitchen and tackled Cargill. Appellant then went for the victim's gun and grabbed it. The two fought over the gun, and he "got the better and push[ed] off" the gun. The gun went off, and the victim was shot. When asked why he shot the victim, appellant testified that he was scared for his life. After he shot the victim, he dropped the gun and ran from the house. As he ran down the street to his car, he felt bullets flying past him, and Cargill was in his truck trying to run him over. Appellant quickly got into his own car and drove off.

**Appeal**

{¶21} On appeal, Dye raises six assignments of error:

1. The Trial Court erred when it overruled Defendant's challenge for cause of one of the jurors who indicated that if she had any doubts after listening to the evidence that she would believe the state's police officer witnesses over the Defendant and decide in favor of the state.

2. The Trial Court erred by overruling Defendant's objection to State's witness, Harold Williams, giving multiple testimonial hearsay evidence as to what he thinks the Defendant told him; what that decedent, James Gray, told him the Defendant said; what someone else said to the Defendant; what the Defendant said to someone else and why said Harold Williams believes the decedent said what he did say to the Defendant, all of which does not fall within any hearing [sic] exceptions.

3.      The Trial Court erred by allowing the State to enter cumulative and new evidence at trial where its probative value is substantially outweighed by the danger of unfair prejudice of confusion of the issue or of misleading the jury and needless presentation of cumulative evidence.

4.      The Trial Court abused its discretion by allowing the admission of picture evidence of the Defendant wearing a plain, gray, hooded sweatshirt, taken on an occasion prior the date of James Gray's fatal shooting, where there was no evidence that the sweatshirt in the pictures was the same sweatshirt worn by the Defendant at the time of James Gray's fatal shooting.

5.      The Trial Court erred when it allowed the admission of statements made by a Third Party through the testimony of an investigating officer.

6.      Appellant was denied effective assistance of  trial counsel where the Court had previously ruled that irrelevant, cumulative and highly prejudicial pictures could not be introduced, shown to the jury or admitted into evidence by the State, and subsequently, Appellant's trial counsel introduced them into evidence and showed the pictures to the jury during the Appellant's direct examination where there was no strategic basis for showing the jury the cumulative, highly prejudicial pictures, that otherwise would not have come in, and appellant was prejudiced as a result.

{¶22} Appellant does not challenge his convictions of murder and additional related offenses as against the manifest weight of the evidence.  Instead, he challenges the trial court's ruling denying his request to remove a juror for cause; argues certain

testimony and exhibits were improperly admitted; and argues his trial counsel provided constitutionally ineffective assistance of counsel. We address the assignments of error in the order presented.

**Juror Issue**

{¶23} Under the first assignment of error, appellant claims the trial court erred when it overruled his challenge for cause of one of the jurors. Pursuant to R.C. 2313.17(B)(9), good cause exists for the removal of a prospective juror when the juror discloses by his or her answers that he or she cannot be a fair and impartial juror, or will not follow the law as given by the court. Similarly, Crim.R. 24(C)(9) provides that a person called as a juror may be challenged for cause when

> the juror is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.

{¶24} A ruling on a challenge for cause will not be overturned on appeal unless it appears that the trial court abused its discretion. *State v. Vails*, 22 Ohio St.2d 103, 258 N.E.2d 225 (1970). The determination of whether a juror is biased involves a judgment of credibility, the basis of which may not always be apparent from the record on appeal, and therefore, a reviewing court will defer to the trial judge who sees and hears the juror. *State v. Huertas*, 51 Ohio St.3d 22, 23, 553 N.E.2d 1058 (1990). A prospective juror challenged for cause should be excused only if the trial court has any doubt as to the

juror's being entirely unbiased. *State v. Allard*, 75 Ohio St.3d 482, 495, 663 N.E.2d 1277 (1996)._

{¶25} Here, appellant claims that Juror No. 5 was biased, but the trial court refused to excuse her with cause, which forced the defense to use one of the allotted peremptory challenges. Appellant claims that the trial court committed prejudicial error warranting a new trial.

{¶26} The record reflect that when Juror No. 5 disclosed that she has a son-in-law in law enforcement, the defense counsel asked her if she would "give the benefit of the doubt to the State" in a close case. Juror No. 5 answered that "if it was not totally clear" to her, she "would probably tend to believe the law [enforcement] officer." After Juror No. 5 made that statement, which appeared to cast doubt on her impartiality, the trial court engaged in a colloquy with the juror and asked several follow-up questions:

THE COURT: * * * do you think that you can evaluate the credibility of witnesses?

JUROR NO. 5: Yes, I do.

THE COURT: Do you think that you can evaluate the credibility of police officers?

JUROR NO. 5: Yes.

THE COURT: So if you find that a police officer is untruthful, can you assert that as you are deliberating?

JUROR NO. 5: Yes.

THE COURT: Do you think that you can be fair and impartial?

JUROR NO. 5: Yes.

| THE COURT: | Okay, do you think that you could go back and if, in fact you felt, you felt that the State had not met their burden of proof and talk to your son-in-law and say the State and the police officers dropped the ball in this case? |
|---|---|
| JUROR NO. 5: | Yes. |
| THE COURT: | Would you feel confident doing that? |
| JUROR NO. 5: | Yes |
| THE COURT: | Okay. And if you felt as if the State had not met their burden of proof, even knowing that there is a person here that died, you could put your name on a not guilty verdict? |
| JUROR NO. 5: | Yes if I — if I truly thought they didn't — yes. |

**{¶27}** Despite that exchange, the defense counsel moved to have Juror No. 5 removed for cause.   The court denied the motion.   The defense counsel then used one of their four peremptory challenges to remove the juror; the record reflects, however, that the defense did not exhaust its allotted peremptory challenges.

**{¶28}** Our review of the colloquy between the trial court and the juror reflects that, although the juror's initial statements appeared to cast some doubt on her impartiality, the juror's qualification to serve as fair and impartial juror was sufficiently rehabilitated upon the trial court's further examination.   She unequivocally affirmed that she would be fair and impartial.   On that basis, the trial court made a determination.   The trial court did not abuse its discretion in declining to remove the juror for cause.

**{¶29}** Furthermore, there was no violation of the Sixth Amendment guarantee of a trial by jury, because Juror No. 5 ultimately did not sit on the jury. The courts have always recognized that peremptory challenges are not of constitutional dimension, but are "a means to achieve the end of an impartial jury." *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id. See also State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 86.

**{¶30}** Finally, a criminal defendant cannot complain of error in the trial court's overruling of a challenge for cause if the ruling does not force the defendant to exhaust the allotted peremptory challenges before the full jury is seated. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 71. Here, the record reflects appellant did not exercise all of his peremptory challenges during the jury selection, and therefore, he could not claim prejudice even if the trial court improperly overruled his challenge for cause. The first assignment of error is without merit.

**Hearsay**

**{¶31}** Under the second assignment of error, appellant claims Harold Williams was improperly permitted to testify to various statements made by the defendant in violation of the hearsay rule. Appellant complains Williams improperly testified that appellant stated to him over the phone that Williams should stop calling him because he was trying to engage in sexual conduct with Vajusi. Appellant also complains Williams

improperly testified that appellant told him he was waiting for Dwain Powell, someone known to other witnesses as a drug dealer, to arrive, and that appellant and Powell later went into a bathroom together.

{¶32} Hearsay is defined as an out-of-court statement offered to prove the truth of the matter asserted. Evid.R. 801(C). Under Evid.R. 801(D)(2)(a), however, a party's own out-of-court statement offered against him is not considered hearsay, because the party-declarant was in court to refute any unfavorable impact of the statement. Staff Note to Evid.R. 801(D)(2)(a). Therefore, appellant's own statements challenged here are not hearsay.

{¶33} Appellant also claims Williams's testimony regarding an exchange between appellant and the victim at one point of the evening — the victim asked appellant to leave the party but appellant refused to leave — constituted impermissible hearsay. Hearsay is by definition a "statement," defined as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion." Evid.R. 801(A). The request or refusal (to leave) testified to by Williams is not an "assertion," because a request or refusal is "incapable of being proved either true or false and, therefore, cannot be offered to prove the truth of the matter asserted." *State v. Young*, 8th Dist. Cuyahoga No. 78058, 2001 Ohio App. LEXIS 1700, 13 (Apr. 12, 2001) (a directive is not a hearsay because it is incapable of being proved either true or false). The second assignment of error lacks merit.

**Alleged Character and Other Prejudicial Evidence**

{¶34} Under the third assignment of error, appellant claims the trial court improperly admitted pictures (state's exhibit Nos. 177 and 178) and videos (state's exhibit Nos. 180 and 181) of him holding a "machine-gun" type of weapon, which were impermissible other-acts evidence under Evid.R. 404(B) and impermissible prejudicial evidence under Evid.R. 403(A).

{¶35} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Here, the images of appellant holding a gun were retrieved from his own cell phone and Harold Williams identified the gun as what appellant was holding to block the side door from closing. The ballistics expert James Kooser identified the gun as an "Intratech 9" that shoots .9 millimeter bullets, which were found outside the home. As such, the photographic evidence is not "other acts" evidence to show appellant's propensity to commit crime prohibited by Evid.R. 404(B). Rather, the photographic evidence was introduced to show identity — it was appellant whom Williams saw holding the particular gun to block the side door and who then engaged in a struggle with the victim over the gun, although that gun was removed from the scuffle before the victim was shot according to one witness's account.

{¶36} Under the third assignment of error, appellant also complains of Mario Cargill's testimony describing appellant's drinking, drug abuse, and poor temperament. Appellant claims this is impermissible character evidence under Evid.R. 404(A), which

states "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." The testimony regarding appellant's drinking, abusing drugs, and acting aggressive was based on the witness's personal observation of appellant's conduct and demeanor on the night of the shooting. It is not impermissible character evidence under Evid.R. 404(A). The third assignment of error is without merit.

**Picture of Appellant on a Prior Occasion**

{¶37} The fourth assignment of error relates to photographs of appellant in a gray sweat suit taken on a prior occasion, which the state introduced as exhibits after several witnesses testified that appellant wore a gray sweatshirt or hoodie on the night of the incident. Appellant argues that this type clothing is too generic to constitute identity evidence and, therefore, the photographs were irrelevant and inadmissible under Evid.R. 402 ("Evidence which is not relevant is not admissible."). Appellant confuses admissibility of evidence and weight of evidence. The photographs of a defendant in an outfit similar to one several witnesses had seen him wearing on the night of the incident is certainly relevant and admissible, and it is up to the trier of fact to determine the weight to be given to this identity evidence. In any event, any prejudicial effect of that identity evidence was eliminated when appellant took the stand and admitted to shooting the victim. The fourth assignment of error is overruled.

**Investigating Officer's Testimony**

{¶38} Under the fifth assignment of error, appellant claims Det. Thomas Lynch provided improper hearsay testimony when he testified regarding what he learned during his investigation from Elizabeth Torres and Dwain Powell about the identity of the shooter.

{¶39} A law enforcement officer's statements offered into evidence to explain the officer's next investigative step is generally not hearsay. *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980). Appellant cites *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, in support of his claim. In *Ricks*, the Supreme Court of Ohio held that the admission of an accomplice's statements tying the defendant to the crime, through the testimony of an investigating officer, violated the Confrontation Clause because the statements were unfairly prejudicial under Evid.R. 403 and the nonhearsay reason given for introducing the statements was a pretext for connecting the defendant to the crime. *Ricks* is not applicable here. Unlike *Ricks*, the identity of the perpetrator was not an issue in this case, because appellant admitted to the shooting. The fifth assignment of error lacks merit.

**Ineffective Assistance of Counsel**

{¶40} Under the sixth assignment of error, appellant claims his trial counsel provided ineffective assistance of counsel by introducing prejudicial photographs of him holding a revolver, a weapon not seen on the night of the shooting.

**{¶41}** In order to establish a claim of ineffective assistance of counsel, appellant must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel's performance will not be deemed ineffective unless the performance is proven to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. *State v. Iacona*, 93 Ohio St.3d 83, 105, 752 N.E.2d 937 (2001). In evaluating a claim of ineffective assistance of counsel, we are mindful that there are countless ways for an attorney to provide effective assistance in a given case and we must give great deference to counsel's performance. *Strickland* at 689. Trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Gooden*, 8th Dist. Cuyahoga No. 88174, 2007-Ohio-2371, ¶ 38, citing *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980).

**{¶42}** Here, the transcript reflects that during the state's examination of Det. Lynch, the state attempted to have the detective testify to several photos retrieved from appellant's cell phones showing him holding a revolver. Because no witnesses had testified to appellant's use of a revolver on the night of the incident, defense counsel objected to the introduction of these photographs and the trial court found these photographs prejudicial and ruled that these photographs could not be introduced through the detective's testimony. Subsequently, when appellant took the stand in his own

defense, defense counsel introduced these photographs and elicited testimony from appellant to show that the photographs were taken long before the shooting and that appellant did not own the weapon but only took the photographs with the weapon so that he could post them on the social media to boost his image and to impress women.

{¶43} We will not second guess appellant's trial counsel's tactical decision to have appellant provide testimony regarding the photographs. Once appellant decided to testify, the state would likely use the photographs in its cross-examination of him. His counsel apparently chose to "draw the sting" out of the likely revelation of these photographs during the state's cross-examination of appellant by bringing out such evidence early, on direct examination. *See State v. Tyler*, 50 Ohio St.3d 24, 34, 553 N.E.2d 576 (1990). This was not an unreasonable tactical decision, and counsel's conduct did not fall below the standard of reasonable representation. Further, appellant fails to demonstrate there is a reasonable probability that the outcome of the trial would have been different. This case hinges on whether the jury believed appellant shot the victim in self-defense. The exclusion of the photographs of appellant holding a weapon not related to the shooting incident from the trial would not have changed the outcome of the trial. The sixth assignment of error is without error.

{¶44} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
TIM McCORMACK, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
EILEEN A. GALLAGHER, J., CONCUR