[Cite as *State v. Dye*, 2021-Ohio-207.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 109366 |
| JAMAL DYE, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 28, 2021

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-15-594386-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Tasha L. Forchione, Assistant Prosecuting Attorney, *for appellee.*

Allen Bloom, *for appellant.*

MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant, Jamal Dye ("Dye"), appeals from the trial court's decision denying his first amended petition for postconviction relief as moot and denying his second amended petition for postconviction relief as untimely. For the reasons set forth below, we affirm.

## I. Introduction

{¶ 2} On March 12, 2015, Dye was arrested in connection with the killing of James Gray ("Gray"). On March 24, 2015, a Cuyahoga County grand jury returned a five-count indictment against Dye that included: Count 1, aggravated murder, a first-degree felony pursuant to R.C. 2903.01(A); Count 2, murder, a first-degree felony pursuant to R.C. 2903.02(A); Count 3, felonious assault, a third-degree felony pursuant to R.C. 2903.11(A)(1); Count 4, discharge of firearm on or near prohibited premises, a first-degree misdemeanor pursuant to R.C. 2923.162(A)(3); and Count 5, carrying concealed weapons, a first-degree misdemeanor pursuant to R.C. 2923.12(A)(2). Counts 1 through 4 included firearm specifications pursuant to R.C. 2941.141(A) and 2941.145(A).

{¶ 3} A jury trial commenced on November 30, 2015. On December 10, 2015, Dye was acquitted of aggravated murder (Count 1) and discharge of firearm (Count 4); Dye was found guilty of murder (Count 2), felonious assault (Count 3), and carrying concealed weapons (Count 5). The trial court sentenced Dye to life in prison with parole eligibility after 18 years.

### A. Dye's Direct Appeal

{¶ 4} Dye filed a direct appeal to this court presenting six assignments of error challenging his convictions. This court affirmed his conviction on December 8, 2016. *State v. Dye*, 8th Dist. Cuyahoga No. 103907, 2016-Ohio-8044. Dye then appealed to the Ohio Supreme Court, which declined to accept jurisdiction. *State v. Dye*, 150 Ohio St. 3d 1442, 2017-Ohio-7843, 82 N.E.3d 1175.

**B. Postconviction Petitions**

{¶ 5} Dye then petitioned the trial court for postconviction relief, which the trial court denied without a hearing. The trial court did not find Dye's arguments to be persuasive or his presented affidavits to be credible. Therefore, the court did not find a hearing was necessary and denied the petition.

{¶ 6} Dye was required to submit his petition for postconviction relief 365 days after submitting the trial transcript to this court for his direct appeal. *See* 2953.21(A)(2). Dye filed the transcript on February 25, 2016. Dye filed his petition for postconviction relief on February 24, 2017, making it timely. That petition included four claims for relief. Dye went on to submit a second amended petition for postconviction relief, which introduced a fifth claim for relief. That second amended petition was untimely because it was submitted on May 5, 2019, well after the deadline.

{¶ 7} Nevertheless, the trial court gave all five of Dye's claims a full and fair review. The court did not find Dye's claims to be credible and determined that they did not warrant a hearing and did not warrant postconviction relief. We do not find that the court abused its discretion in making that decision.

## II. Factual Background

{¶ 8} The facts of the shooting were previously set forth by this court in Dye's direct appeal, *State v. Dye*, 8th Dist. Cuyahoga No. 103907, 2016-Ohio-8044. We incorporate the relevant facts:

> **[¶ 1]** Jamal Dye appeals from a judgment of the Cuyahoga County Court of Common Pleas that convicted him of murder and additional

related offenses following a jury trial.  Having reviewed the record and applicable law, we affirm his convictions.

**[¶ 2]** On March 8, 2015, James Gray held a party at his house on Linnet Avenue near West 105th Street in Cleveland.  The partygoers consumed alcohol and used drugs into midnight.  All night long, tension brewed between appellant Jamal Dye, 20, and James Gray, 25.  The tension culminated in the shooting death of Gray ("victim") by Dye ("appellant") around 3:30 a.m.

**[¶ 3]** During the ten-day trial, the state presented 19 witnesses.  Seven individuals who attended the party that night testified, six for the state and one for the defense.  Appellant also took the stand.  He claimed he shot the victim in self-defense.  The jury also viewed the house where the shooting took place.

**[¶ 4]** After a lengthy jury trial, the jury acquitted appellant of aggravated murder but found him guilty of murder.  The jury also found him guilty of felonious assault and carrying a concealed weapon.  The trial court sentenced appellant to 18 years to life.

## A. Testimony by the State's Witnesses

**[¶ 5]** Of the state's witnesses who were at the party that night, most of them did not witness the shooting but testified to the conflict between appellant and the victim that precipitated the shooting.  These witnesses' accounts of how the events of the evening unfolded varied in details and were not entirely consistent with each other.  There was, however, one eyewitness to the shooting, Elizabeth Torres, and she testified for the state as well.

### Testimony of Partygoers who Did Not Witness the Shooting

**[¶ 6]** Harold Williams, a friend of the victim, testified that tension arose between appellant and the victim on the night of the incident over Williams's ex-girlfriend Idrijana Vajusi.  When Vajusi arrived with her friend Monica Correa, Williams was not happy to see Vajusi at the party.  He asked her to leave but she would not.  Williams and Correa then went upstairs to engage in sex.  Later, Williams told appellant about his sexual encounter with Correa and encouraged appellant to engage in sex with Vajusi as well as to take Vajusi away from the party.  Appellant then left the party with the two women.  Williams later called Vajusi on her phone but appellant answered the phone.  Appellant told Williams to stop calling because he was "[trying to have sex]" and hung

up the phone.  Feeling disrespected, Williams called appellant back on Vajusi's phone again and Vajusi answered the phone.  The two started to argue.  Appellant got on the phone.  Williams told appellant not to bring Vajusi back to the party and handed his phone to the victim.  Appellant then argued with the victim, who was visibly angry.  Despite Williams's request, appellant returned to the victim's house with the two women.  The tension between appellant and the victim escalated.  The victim asked appellant to leave, but appellant refused.  The victim then challenged appellant to a fight in the basement.  At that point, appellant left but hinted that he would return soon.

[¶ 7] Moments after, Williams heard gunshots erupting outside.  He rushed to the side door trying to lock the door.  Appellant used a black pistol to block the door from closing — Williams identified the gun as the same gun shown in the state's exhibit Nos. 177 and 178, photographs of appellant holding a gun on a prior occasion.  Another partygoer and the victim's cousin, Mario Cargill, and appellant then struggled over the gun in the kitchen area.  Both Cargill and appellant fell into a window.  According to Williams, while appellant and Cargill struggled over the gun, the victim went upstairs to retrieve a shotgun, in an attempt to "calm" the situation.

[¶ 8] After both Cargill and appellant fell into the widow, Cargill wrestled appellant to the ground, while appellant still held the pistol in his hand.  Either the victim or another individual by the nickname of "Tone" then ran in and kicked the pistol out of appellant's hand.  Williams then ran out of the house to get away from the scuffle.  While hiding, he heard gunshots 30 feet away.  According to Cargill, who also testified, Williams grabbed the gun and took it with him when he ran out of the house.

* * *

[¶ 11] Mario Cargill, the victim's cousin, also testified about the events leading to the shooting.  He testified that there had been past conflict between appellant and the victim.  When he arrived at the party, the victim told him to be prepared for a fight between the victim and appellant.  When appellant arrived with Vajusi and Correa, he acted disrespectfully by entering the house through the front door, brushing past Cargill's girlfriend Elizabeth Torres, which caused an argument between Cargill and appellant.  At the request of Torres, the argument de-escalated.  Later, Cargill saw appellant and victim in a heated argument and one of appellant's friends handed appellant a silver gun.  According to Cargill, Cargill helped de-escalate the conflict at this time.

Appellant and the victim then headed to the front porch, and the victim challenged appellant to a fight in the basement. Appellant and the victim returned to the house without a fight.

[¶ 12] Cargill then went into a bedroom with his girlfriend Elizabeth Torres and their baby. Thirty to forty minutes later, he heard the noises of a scuffle coming from the kitchen area. He went to the kitchen and saw appellant and the victim struggling with each other against the window over a gun appellant was holding. It was not the silver gun he saw someone handing to appellant earlier, but a "Tec-9," a type of gun with which he was familiar. To stop the trigger from being pulled, Cargill grabbed the gun from appellant, but dropped it when the victim's dog came up and bit Cargill on the leg. At this point, Harold Williams picked up the gun and ran outside with the gun, while appellant and the victim continued to fight. Cargill went into a bathroom to check on his dog bite. While in the bathroom, he heard a gunshot. He rushed to the kitchen to find the victim lying on the ground. He then heard two or three gunshots coming from the outside. Cargill ran outside and jumped into his truck to look for appellant. He found appellant walking down the street holding the silver gun he had seen on the earlier occasion. Cargill pulled his truck in front of appellant, and the two fought with each other. Cargill asked appellant, "why did you kill my cousin?" Appellant put the gun to Cargill's head and said, "I'll kill you too." As the two struggled, they were pulled apart by others. Cargill returned to the house and was met by the police. Joseph Kapostasy, a neighbor, witnessed the struggle between appellant and Cargill in the street.

## B. Eyewitness Testimony

[¶ 13] While the other witnesses were only able to testify to the confrontations between appellant and the victim leading to the eventual shooting, Cargill's girlfriend Elizabeth Torres witnessed the shooting. Also, unlike the other witnesses, Torres testified she did not consume any alcohol or use any drugs that night. She provided the following eyewitness account.

[¶ 14] Torres testified that, on the day of the incident, she and her baby were in the victim's home to spend time with Cargill, the baby's father. While in a first-floor bedroom with Cargill and the baby, she heard gunshots erupting outside the house. Cargill left to find out what was going on. When Torres heard a second round of gunshots, Torres herself went outside to find out what was taking place. She saw appellant, the victim, and Cargill were all outside: the victim was

holding a shotgun, and appellant was shooting a black gun in the air. All three men then ran back to the house. The victim went through the front door; appellant went through the side door; and Cargill ran toward the back of the house. Still outside the house herself, Torres then saw, through the front door, appellant shooting the victim as the victim walked into the kitchen. The victim fell to the floor. Torres did not observe any struggle between the two men prior to the shooting.

\* \* \*

## C. Defense

[¶ 18] The defense called Andre Barnes, a friend of appellant who was at the party that night. Barnes testified he never saw appellant with a weapon that night. He heard a commotion coming from the first floor while he was in the basement. He went upstairs and saw appellant on the ground surrounded by people who appeared to be stomping him; he got scared and ran from the house.

[¶ 19] Appellant took the stand and testified in his own defense. He gave a drastically different account of how the shooting occurred. He admitted he was drinking and smoking marijuana on the night of the incident. He also admitted shooting the victim, but claimed he acted in self-defense.

[¶ 20] Appellant testified that he left the victim's house party with the two women, Vajusi and Correa. When they returned to the party, he was approached by Harold Williams, who was unhappy he brought Vajusi back. "Tone" approached him as well, and they got into an argument. Someone then tackled him, and he fell on the ground in the kitchen. Several people were kicking and stomping him, and going through his pockets. When he got up, Cargill and the victim "had guns in [his] face." Cargill was holding a shotgun; and the victim was holding a handgun. He held his hands up, saying "don't shoot me." His friend "Adam" then came into the kitchen and tackled Cargill. Appellant then went for the victim's gun and grabbed it. The two fought over the gun, and he "got the better and push[ed] off" the gun. The gun went off, and the victim was shot. When asked why he shot the victim, appellant testified that he was scared for his life. After he shot the victim, he dropped the gun and ran from the house. As he ran down the street to his car, he felt bullets flying past him, and Cargill was in his truck trying to run him over. Appellant quickly got into his own car and drove off.

{¶ 9} In addition to the testimony of those involved, the state also presented evidence of Dye's familiarity with guns, including three photographs of Dye holding a "TEC-9" semiautomatic pistol, the same type of gun used to kill Gray. Dye initially stated that the pictures were taken months before the March 8, 2015 shooting and had no bearing on the incident, but metadata established the photographs were taken on August 8, 2014, December 28, 2014, and February 15, 2015, respectively.

{¶ 10} On cross-examination, Dye also stated that no guns had been found in his house. The state presented evidence that the Cleveland police department had seized two guns from his room in June 2014. Dye was never charged for possession of these weapons, but he was aware that the weapons had been seized from his room.

{¶ 11} All these facts were before this court on Dye's direct appeal. Dye presented six assignments of error. The majority of Dye's appeal concerned the introduction of evidence by his counsel, the trial court's decision to allow certain other evidence in over objection, and the inclusion of certain jurors. After careful review, we affirmed the decisions of the trial court. *See Dye*, 8th Dist. Cuyahoga No. 103907, 2016-Ohio-8044.

### III. Dye's Petitions for Postconviction Relief

{¶ 12} His conviction having been affirmed on appeal, Dye filed a petition for postconviction relief on February 24, 2017, raising four grounds for relief:

> Petitioner failed to receive adequate representation when the key eyewitness testimony of witness Lisa Kinney was not presented to the jury.

Petitioner failed to receive adequate representation when the key eyewitness testimony of witness John Bella was not presented to the jury.

Petitioner failed to receive adequate representation when the key eyewitness testimony of witness Lewis Richardson was not presented to the jury.

Petitioner failed to receive adequate representation when trial counsel failed to present evidence establishing that Jamal Dye was correct when he said that he never owned any guns in his house.

{¶ 13} Dye filed an amended first petition for postconviction relief on February 25, 2017, raising the same grounds for relief. In his amended petition, Dye included a declaration from Robert Slattery — his current counsel's investigator — regarding Lisa Kinney and Lewis Richardson, two of the three eyewitnesses Dye claims should have testified at his trial.

{¶ 14} Inexplicably, the state did not respond for over a year; on July 16, 2018, the state filed a motion for leave to file a brief in opposition, which was granted. The state argued that the three individuals Dye represents as eyewitnesses — Kinney, Bella, and Richardson — were friends of his and lacked credibility. The state also argued that the eyewitness testimony of Elizabeth Torres presented at trial disputes the statements and affidavits of the three eyewitnesses.

{¶ 15} On July 31, 2018, Dye filed a motion for leave to file a reply brief with an attached reply. Dye argued in response that Torres's testimony actually corroborates the testimony of his new eyewitnesses and his own testimony.

{¶ 16} On May 5, 2019, more than two years after the deadline to file a petition for postconviction relief, Dye filed a motion for leave to file a second

amended petition for postconviction relief, with an attached second amended petition. Dye included five additional exhibits and raised a fifth ground for relief, he claimed he was denied effective assistance of counsel based on a conflict of interest held by his trial counsel.

{¶ 17} Dye incorporated his first amended petition for postconviction relief into this new amended petition. In the course of presenting his five claims for relief, Dye presented the following affidavit testimony that was not presented to the jury.

### A. Affidavit Testimony of Lisa Kinney

{¶ 18} Dye claimed ineffective assistance of counsel because Lisa Kinney did not testify at trial. Trial counsel's investigator located Kinney, who was a friend of Dye's family. Kinney was at the party the night of the shooting, but the 48-year-old did not participate in the partying and was planning on leaving because she quickly realized that this party was for a younger crowd. However, before she left, the shooting occurred.

{¶ 19} Kinney avers that she saw three men, two of them armed, beat and rob Dye in the kitchen. She saw Dye struggle to his feet and wrestle with Gray for his handgun. She heard the gun go off and saw Gray fall to the floor.

### B. Affidavit Testimony of Jonathan Bella

{¶ 20} Dye also claimed ineffective assistance of counsel because Bella did not testify at trial. Bella was a longtime friend of both Dye and Gray. Bella allegedly saw Dye and Gray arguing about a girl and saw Gray strike Dye in the face. Bella, like Kinney, also allegedly saw Gray and two others beat and rob Dye in the kitchen.

One individual was pointing a shotgun at Dye, but before he could fire, another partygoer tackled the individual with the shotgun. At that point, Dye struggled to his feet and grappled with Gray for the handgun. Bella heard a shot and saw Gray fall to the ground.

{¶ 21} Bella stated that he contacted trial counsel after the shooting and asked him to represent Dye. Bella avers that he did not tell Dye he saw the shooting until years later, but avers that he did tell trial counsel he was an eyewitness when he first contacted trial counsel. He avers that he told trial counsel that he did not want to testify because he was on probation and had violated his probation conditions by attending the party. Trial counsel has consistently stated that Bella never told him that he was an eyewitness.

### C. Affidavit Testimony of Lewis Richardson

{¶ 22} Along with the absent testimony of Kinney and Bella, Dye claims ineffective assistance of counsel because Lewis Richardson, a friend of Dye's, did not testify at trial. Richardson also avers that he saw Dye get beaten and robbed by Gray and his two friends. He also allegedly saw Dye struggle to his feet and grapple for the handgun with Gray. Richardson heard the gun go off and saw Gray fall to the ground.

### D. Evidence that Dye did not Own Guns

{¶ 23} Dye also alleges that trial counsel was ineffective because he knew there were witnesses that could have established the guns taken from Dye's room did not belong to him. Dye's mother stated that, a few days before the guns were

seized around June 2014, she let Dye's friend Shawn Williams ("Williams"), into Dye's room. A few days later Williams was arrested and, to assist in his own case, told police that there were guns in Dye's room.

{¶ 24} Police later arrived at the house with a limited search warrant only for Dye's bedroom, went to Dye's room, and immediately retrieved the guns. Dye was never charged or prosecuted for ownership or possession of the guns.

{¶ 25} Dye alleges that trial counsel was blindsided by this information at trial and that his failure to prepare for this line of questioning and prove that it was false prejudiced Dye.

### E. Conflict of Interest

{¶ 26} In his fifth ground for postconviction, Dye claims he was prejudiced by a conflict of interest between his trial counsel and Bella. Prior to Dye's indictment, trial counsel represented Bella in a criminal case. Bella was placed on probation with conditions, one of which was that he not use any drugs.

{¶ 27} When Dye was arrested, Bella introduced trial counsel to Dye. At that time, Bella avers that he told trial counsel he had been at the party, witnessed the confrontation, and that Dye was acting in self-defense. Bella avers that he then told trial counsel he did not want to testify. Bella also avers that he did not tell Dye he was a witness to the shooting at that time.

{¶ 28} Dye argues that counsel made the decision not to put Bella on the stand. He argues that trial counsel knew, or should have known, that this created a clear conflict that prejudiced Dye.

{¶ 29} Dye avers that he learned in February 2019 that Bella had actually witnessed the shooting and had been on probation at the time. Previously, Dye avers that he had only been aware that Bella had attended the party.

{¶ 30} Current counsel interviewed trial counsel in March and April 2019. Trial counsel stated that Bella had not told him about being an eyewitness. However, Dye's mother averred that during her initial conversation with trial counsel, trial counsel told her he already knew about Dye's claims of self-defense after speaking with Bella. Dye's mother does not aver that trial counsel told her he knew Bella was an eyewitness, just that he knew about the self-defense claim.

## F. Trial Court Denied Postconviction Relief

{¶ 31} The trial court reviewed all the affidavits submitted even though Dye's second amended petition for postconviction relief was untimely. On December 12, 2019, the trial court denied Dye's second amended petition for postconviction relief and issued findings of fact and conclusions of law. The first petition for postconviction relief and amended first petition were denied as moot. All the claims for relief from the first petition were incorporated in the second amended petition for postconviction relief and the trial court fully reviewed those claims. The court found that Dye's arguments were not credible and that he had the opportunity to raise these arguments previously and failed to do so, so they were barred by res judicata.

{¶ 32} Dye now appeals the denial of his petition for postconviction relief and provides three assignments of error for our review.

## IV. Assignments of Error

### First Assignment of Error

The trial court erred when it denied Appellant's petition for post-conviction relief which asserted that trial counsel was inadequate for the cumulative failure of presenting (A) the testimony of three critical eyewitnesses to the shooting AND further failing to present (B) testimony and evidence to support Appellant's testimony and position at trial that he was NOT and NEVER was the owner of the weapons that were introduced by the prosecution, over defense objection.

### Second Assignment of Error

The trial court erred when it denied Appellant's petition for post-conviction relief which asserted that trial counsel was inadequate in that he was conflicted in representing Appellant where he also represented Jonathan Bella, a critical eye witness, who had an interest adverse to Appellant.

### Third Assignment of Error

The trial court's conclusion of law that the [second] amended petition for post-conviction relief was untimely is flawed — all five of the grounds raised in the [second] amended petition for post-conviction relief are properly before this court.

## V. Analysis

### A. Standard of Review

{¶ 33} We review decisions denying postconviction relief without a hearing for an abuse of discretion. *State v. Abdussatar*, 8th Dist. Cuyahoga No. 92439, 2009-Ohio-5232, ¶ 16. "The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

## VI. Summary

{¶ 34} We do not find an abuse of discretion. Dye was required to submit his petition for postconviction relief 365 days after submitting the trial transcript to this court for his direct appeal. *See* R.C. 2953.21(A)(2). Dye filed the transcript on February 25, 2016. Dye filed his first petition for postconviction relief on February 24, 2017, making it timely. That petition included four claims for relief. Dye went on to submit a second amended petition for postconviction relief, which introduced a fifth claim for relief. The second amended petition was untimely because it was submitted on May 5, 2019, well after the deadline.

{¶ 35} Nevertheless, even if the second amended petition was timely, the trial court gave all five of Dye's claims a full and fair review. The court did not find Dye's claims to be credible and determined that they did not warrant a hearing and did not warrant postconviction relief. We do not find that the court abused its discretion in making that decision. We address each assignment of error in turn below.

### A. First Assignment of Error

{¶ 36} Dye's first assignment of error concerns his first four grounds for relief presented in his first, timely petition for postconviction relief. He alleges that his counsel was ineffective for failing to present the testimony of Kinney, Bella, and Richardson. He also claims that counsel was ineffective for failing to present evidence that Dye was not the owner of the weapons found in his room. The trial court found that Dye did not meet his high burden to prove ineffective assistance of

counsel. After careful review, we find that the trial court did not abuse its discretion in making this determination.

{¶ 37} In order to be entitled to a hearing on a petition for postconviction relief alleging ineffective assistance of counsel, the petitioner must submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness. *State v. Jackson*, 64 Ohio St.2d 107, 413 N.E.2d 819 (1980), syllabus. *See also State v. Cole*, 2 Ohio St.3d 112, 114, 443 N.E.2d 169 (1982) ("[w]here ineffective assistance of counsel is alleged in a petition for postconviction relief, the defendant, in order to secure a hearing on his petition, must proffer evidence which, if believed, would establish not only that his trial counsel had substantially violated at least one of a defense attorney's essential duties to his client but also that said violation was prejudicial to the defendant.") If a petitioner fails to meet this burden, the trial court may dismiss the petition for postconviction relief without a hearing. *Jackson* at 111.

{¶ 38} A postconviction petitioner who asserts a claim of ineffective assistance bears the initial burden of submitting evidentiary documents containing sufficient operative facts to demonstrate "that his attorney seriously erred and that the deficient performance actually prejudiced him." *State v. Theis*, 8th Dist. Cuyahoga No. 82161, 2003-Ohio-1968, ¶ 10, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Jackson* at syllabus. In order to satisfy the prejudice requirement, "the defendant must show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different." *Strickland* at 694. The court found that Dye did not show that counsel erred, and that even if counsel had erred, Dye was not prejudiced.

### 1. Failure to Call Kinney, Bella, and Richardson

{¶ 39} The decision to call witnesses is a trial strategy decision. *See State v. Oliver*, 101 Ohio App. 3d 587, 656 N.E.2d 348 (8th Dist.1995). Even when a strategic decision is questionable, we will generally refrain from second-guessing trial counsel's decisions. *State v. Quinones*, 8th Dist. Cuyahoga No. 104016, 2016-Ohio-7225, ¶ 25. We will not second-guess trial counsel here.

### 2. Lisa Kinney

{¶ 40} According to Dye, an investigator for trial counsel interviewed Kinney and trial counsel declined to put her on the stand. Kinney was a family friend of Dye's and it is possible that her story contradicted Dye's own or that counsel did not believe the jury would find her to be credible. Kinney testified she saw three men beating and robbing Dye before the shooting. Yet photo evidence at trial showed that Dye only had a scrape to his calf and a swollen pinky finger. It is possible trial counsel determined that this evidence was inconsistent with Kinney's testimony that she saw Dye being stomped on and aggressively robbed.

{¶ 41} Regardless, counsel was aware of Kinney and declined to have her testify. We will not second-guess trial counsel and therefore do not find that counsel was deficient as to his decision regarding Kinney.

### 3. Jonathan Bella

{¶ 42} Dye is also alleging that counsel failed to identify Bella as an eyewitness and that his testimony would have bolstered his self-defense argument. Essentially, he argues that counsel failed to adequately investigate. We find that counsel did not err by failing to identify Bella as an eyewitness, and even if we did find error, the trial would not have been different if Bella had testified.

{¶ 43} We give defense counsel the benefit of the doubt in matters of trial strategy and a failure to investigate does not automatically mean that counsel was ineffective. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.").

{¶ 44} Here, counsel did investigate Dye's case thoroughly and therefore met his duty of making a reasonable investigation. There were over 40 individuals who attended the party. Bella was not listed in any police reports as having attended. As we stated previously, Bella asked trial counsel to represent Dye, but according to trial counsel, Bella never shared that he was at the party, much less that he had testimony supporting Dye's claims of self-defense. Counsel can hardly be deficient for failing to identify Bella when Bella himself was not forthcoming. Thus, we find that counsel sufficiently investigated and did not err in failing to identify Bella as an eyewitness.

### 4. Lewis Richardson

{¶ 45} Similar to his claims about Bella, Dye argues that trial counsel was ineffective for failing to identify Richardson as a witness and that he was prejudiced as a result. We find no merit to this claim.

{¶ 46} Dye alleges that his current investigator was able to identify Richardson as a valuable witness and secure helpful testimony from him years after the incident, suggesting that trial counsel was ineffectual in his own investigations. However, we cannot fault trial counsel for not identifying Richardson when Richardson does not appear in any witness accounts or reports of any kind as having attended the party. We are cognizant of the difficulty trial counsel faced in identifying and interviewing over 40 attendees, many of whom, it appears, did not want to be identified as having attended a party where many attendees were using drugs. If Dye were aware Richardson had attended at the time, he apparently did not share that fact with trial counsel.

{¶ 47} Of course, trial counsel did investigate and interview some partygoers. Trial counsel put Andre Barnes on the stand. Barnes was a partygoer who admitted to being friends with Dye. He stated that he saw Dye being knocked to the ground, stomped on, and robbed prior to the shooting. Unlike Richardson, Barnes does not claim to have seen the shooting as he ran from the scene. While testimony regarding the shooting is critical, even if we found counsel deficient for not tracking down Richardson, the jury apparently did not believe that Dye had been beaten and robbed moments prior to the shooting. Even if Richardson had testified

that he had seen Dye being robbed and that he saw Dye and Gray wrestling for the gun, there is nothing that indicates the jury would have believed that testimony.

{¶ 48} Rather, as we found in Dye's direct appeal, the jury was convinced by the testimony of Elizabeth Torres. Torres was not intoxicated, unlike Richardson or Bella, and she states that she did not see Dye being beaten and robbed. Instead, she testified that she saw Dye standing in the kitchen and then shooting Gray as Gray entered the kitchen. The jury relied on her testimony over Barnes, who claimed that he saw Dye being beaten and robbed. Richardson may have bolstered Barnes's testimony, but he would not have added anything to the defense's argument for self-defense in light of Torres's testimony.

{¶ 49} Accordingly, we find that trial counsel did not err by not identifying Richardson as a witness, and that even if counsel had erred, there was no prejudice to Dye such that the outcome of the trial would have been different.

### 5. Evidence of Gun Ownership

{¶ 50} Dye also claims ineffective assistance of counsel because trial counsel failed to present evidence that Dye did not own the guns police found in his room after the shooting. Dye argues that testimony from his mother could have provided an explanation for how guns were found in his room. Dye's mother avers that Dye's friend, Williams, asked to check Dye's room for items he had left there in June 2014. Then, days later, Williams was arrested. Following William's arrest, police searched Dye's room with a warrant and found two weapons. Dye was never charged for possession of the guns.

{¶ 51} Dye was cross-examined by the state on the presence of the guns in his room. During cross-examination, Dye stated that, among other things, it was possible Williams had placed the guns in his room. The court did not find Dye was prejudiced by trial counsel's failure to present this information. We agree.

{¶ 52} Dye was not truthful when he said guns were never found in his home; even if the guns were not his, he knew guns were found in his bedroom. Moreover, whether they were his guns or not was immaterial to the jury's consideration of the case. The jury was also shown photos of Dye holding a "TEC-9," the type of weapon used to shoot Gray. Dye was tagged in the photos, which were posted to social media. He knew about the photos. The state merely attempted to use the photos to prove that Dye had familiarity with the gun used, not that he owned the guns or any guns. They were able to make that case without the evidence regarding the guns seized from Dye's room. Therefore, trial counsel's failure to inform the jury that Dye did not own the guns found in his room was not prejudicial to Dye; the state had already proven that Dye was familiar with the type of gun used to kill Gray.

**Res Judicata**

{¶ 53} The trial court also found that Dye's arguments were barred by res judicata. We do not agree. However, the trial court did not abuse its discretion in denying Dye's petition because, as we stated above, Dye has not presented sufficient evidence to meet his heavy burden.

{¶ 54} "Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and

litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at trial, which resulted in that judgment of conviction, or on an appeal from that judgment." *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), paragraph nine of the syllabus.

{¶ 55} However, when an appellant argues that trial counsel was ineffective for failing to present a witness at trial, that claim is not barred by res judicata. *See State v. Jones*, 8th Dist. Cuyahoga No. 83601, 2004-Ohio-3868, ¶ 6; *State v. McDaniel*, 8th Dist. Cuyahoga No. 109611, 2020-Ohio-4755, ¶ 5. These types of claims cannot be raised on direct appeal because they necessarily rely on evidence outside of the record. Therefore, they cannot be barred by res judicata.

{¶ 56} Even so, the trial court did not abuse its discretion in denying Dye's claims without a hearing. To warrant a hearing, the evidence outside the record that is submitted in support of a petition '"must meet some threshold standard of cogency; otherwise it would be too easy to defeat the holding of *Perry* by simply attaching as exhibits evidence [that] is only marginally significant and does not advance the petitioner's claim beyond mere hypothesis and a desire for further discovery.'" *State v. Lawson*, 103 Ohio App.3d 307, 315, 659 N.E.2d 362 (12th Dist.1995), quoting *State v. Coleman*, 1st Dist. Hamilton No. C-900811, 1993 Ohio App. LEXIS 1485, 21 (Mar. 17, 1993).

{¶ 57} As we discussed in detail above, Dye has simply not presented sufficient evidence to overcome the required threshold. Dye's affidavits instead

provide an alternative account of events that does not match the facts or overcome the evidence presented by the state.

{¶ 58} Accordingly, Dye's first assignment of error is overruled.

**B. Second Assignment of Error**

The trial court erred when it denied Appellant's Petition for Post-Conviction Relief which asserted that trial counsel was inadequate in that he was conflicted in representing Appellant where he also represented Jonathan Bella, a critical eyewitness who had an interest adverse to Appellant.

{¶ 59} Dye argues that trial counsel had a conflict of interest in representing him because he previously represented Bella and protected Bella's interests over Dye's. Bella had violated the conditions of his probation by consuming drugs and alcohol at the party and would have had to admit to that fact if he testified. However, we disagree that there was a conflict of interest.

{¶ 60} The Sixth Amendment guarantee of effective assistance of counsel includes the right to counsel's undivided loyalties. *Glasser v. United States*, 315 U.S. 62 S.Ct. 457, 86 L.Ed. 680 (1942). To establish a Sixth Amendment violation for a conflict of interest, a defendant raising a post-trial objection "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1990). The mere "possibility of conflict is insufficient to impugn a criminal conviction." *Id.* at 350. A court will presume prejudice only if the defendant "demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.*

{¶ 61} Dye has not identified an actual conflict of interest, and we find no evidence of an actual conflict. Dye argues that trial counsel knew that Bella would have had to admit that he was in violation of his probation by attending the party, and that trial counsel was therefore protecting Bella to Dye's detriment. However, even if we accept that trial counsel knew Bella was an eyewitness, which we do not, trial counsel was not actively representing Bella at the time of Dye's trial. Therefore, there was no active representation of conflicting interests.

{¶ 62} Further, there are competing claims as to whether trial counsel knew Bella was a witness and that he did not want to testify for fear of admitting a probation violation. If trial counsel is to be found more credible, which the trial court found, there is no evidence that he had any knowledge of a conflict of interest even if one existed. Without knowledge of the supposed conflict, trial counsel's performance could not have been impacted by the conflict. We therefore agree with the trial court that Dye has not established an actual conflict of interest with any particularity.

{¶ 63} The trial court went on to state that, even if trial counsel knew Bella was an eyewitness and a conflict of interest existed, Dye was not prejudiced by Bella not testifying.

{¶ 64} Dye argues that Bella would have been an ironclad witness in support of his self-defense theory because he was friends with both Dye and Gray and would have been compromising his probation by testifying. The trial court did not agree. We do not find the trial court abused its discretion.

{¶ 65} As we stated previously, the jury was not convinced by Dye's self-defense story. Dye and Barnes had already testified about Dye being beaten and defending himself, only shooting Gray out of necessity. The jury instead believed Elizabeth Torres. Bella would not have added anything the jury had not already rejected. Bella's testimony would not have changed the outcome of the trial.

{¶ 66} Also, even if counsel did know that Bella was an eyewitness, there is no evidence he was affected by his prior representation of Bella in making the strategic decision not to call Bella. We do not find that the trial court abused its discretion in finding there was no conflict and that Dye would not have been prejudiced if there was a conflict.

{¶ 67} The second assignment of error is overruled.

## C. Third Assignment of Error

The trial court's conclusion of law that the [second] amended petition for post-conviction relief was untimely is flawed — all five of the grounds raised in the [second] amended petition for post-conviction relief are properly before this court.

{¶ 68} Dye argues that his second amended petition for postconviction relief was timely and should have been reviewed by the trial court. The trial court concluded in its journal entry that Dye's second amended petition for postconviction relief was untimely. As a result, the court found it lacked jurisdiction to consider the petition. However, a careful examination of the trial court's findings of fact and conclusions of law reveal that, though the court found the second amended petition to be untimely, the court still fully considered the arguments.

{¶ 69} Appellee argues that the court did fully consider all five of Dye's grounds for relief, including the fifth claim found in the second amended petition. In his reply brief to this court, Dye agrees that the court did ultimately consider all his arguments.

{¶ 70} Dye's third assignment of error asks this court to find that the trial court erred in ruling his second amended petition to be untimely. His purpose in doing so is to have the trial court review all his claims to relief both in his first amended petition and his second amended petition. All parties and this court agree that the trial court did review all his claims for relief. Accordingly, we overrule Dye's third assignment of error as moot.

## VI. Conclusion

{¶ 71} After careful review of the record and the trial court's findings of fact and conclusions of law, we find that the court did not abuse its discretion in denying Dye's second amended petition for postconviction relief. The judgment of the trial court is affirmed.

{¶ 72} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

EILEEN T. GALLAGHER, P.J., and
EILEEN A. GALLAGHER, J., CONCUR